THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEPHEN MANKUS : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : <br> SWAN REEFER I A/S and : <br> LAURITZEN REEFERS A/S and DEL : <br> MONTE FRESH PRODUCE : <br> INTERNATIONAL, INC. : <br> : <br> Defendants. | Civil Action No. 02-3425 |

REPLY OF SWAN REEFER 1 A.S. TO PLAINTIFF'S OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In Plaintiff's response to Defendants' Motion for Summary Judgment, Plaintiff argues that the issue of the electrical cords is one of obviousness which must be left to the jury. That argument completely ignores the vessel owner's right to rely upon the competence of the stevedore to safely carry out the discharge operation. There is no dispute that for a period of some four to five years, TUNDRA TRADER and her sister TUNDRA CONSUMER, had been arriving the Port of Philadelphia with the electrical cords on the third-tier containers bundled but left hanging several feet below their cages. The ship boss, William Collins, repeatedly testified that this was a condition that he expected and that they were competent to deal with. (Collins Dep. Pp 37, 64, 65, 89, 90). Over the course of the many years that this had been going on, the vessel had a right to expect that the stevedore would be able to discharge the containers without causing injury

to anyone, even in those circumstances where on occasion, a cord became unbundled. (Collins Dep. P 52, 53). Plaintiff can point to no indication that the vessel had greater knowledge of this than stevedores. Not surprising that Plaintiff seeks to put this into the obviousness category in order to create a question of fact for the jury.

### A. TURNOVER DUTY

The duty of the vessel prior to commencement of discharge is clearly set out in Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 101 Sup. Ct. 1617 and 68 L.Ed. 2d 1.

The turnover duty is satisfied once: "the ship owner [has] the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property". Id. at 167. That is precisely the way the vessel was turned over to stevedores at the Del Monte terminal. Plaintiff argues that "simply because the ship boss had seen cords fail from time to time over a five-year period doesn't exonerate the vessel from its clearly admitted fault. On the contrary, the vessel clearly was entitled to rely on the expertise of the stevedore who had safely discharged the vessel under similar circumstances during the preceding five-year period. In Scindia, the Court recognized that "there are circumstances in which the ship owner has a duty to act where the danger to the longshoreman arises from the malfunctioning of the ship's gear being used in the cargo operations . . . The Court went on to note that there may be circumstances in which the "[stevedore's] judgment [with regard to the defective winch] was so obviously improvident that [the ship owner], if it knew of the defect and that [the stevedore] was continuing to use it, should have realized that the winch presented an unreasonable risk of

harm to the longshoreman, and that in such circumstances it had a duty to intervene and repair the ship's winch. The same would be true if the defect existed from the outset and [the ship owner] must be deemed to have been aware of its condition. Id. at 175-176.

In Scindia, the issue involved a winch that had been operating in a defective manner for approximately two days. The defect complained of in the present case is not a defective winch or a piece of ship's equipment, but rather, part of the cargo of containers that Delaware River Stevedores had discharged safely and without incident over a number of years. The vessel owner should not be deemed to have knowledge any greater than that of the stevedore whose expertise places him in a superior position to either correct or object to conditions on the vessel.

## B. DUTY TO INTERVENE

The equipment at question in the present case is not a piece of ship's gear or a part a part of the ship itself but rather part of her cargo. In Carpenter v. Universal Star Shipping S.A., 924 F.2d, 1539 (9th Cir. 1991) the Court distinguished between vessels gear and cargo in connection with the vessels duty to intervene. The Court in Carpenter stated: "the Scindia Court, accordingly, strictly limited the duty to intervene. It is not enough that the vessel knows or should know of a defect, and that the vessel knows the stevedores' actions have resulted in an unreasonable risk to longshoremen. It is further required that a part of the ship itself, the ship's "gear" caused the injury. Such a limitation effectively prevents the misallocation of costs feared by Scindia Court." This provides further reason for the vessel to rely on the skill of the stevedore.

Plaintiff has tried mightily to put this case in the context of an open and obvious situation which it argues creates a question of fact for the jury. Essentially, Plaintiff

3

argues that the condition of electrical cords created a "latent defect". In <u>Howlett v. Berkdale Shipping</u>, 512 U.S. 92, 114 Sup. Ct. 1057 (1994), the Supreme Court described the vessel's turnover duty to warn of latent defects as a narrow one "the duty attaches only to latent hazards, defined as hazards that are not known to the stevedore and that would be neither obvious to nor anticipated by a skilled stevedore in the competent performance of his work. Citing <u>Scindia</u>, 451 U.S. at 167. 101 at Spring Court at 1622.

The testimony of Williams Collins, the Ship Boss belies on the argument. The Stevedore was well aware that the third tier container cords were bundled but left hanging and moreover, was well aware that in the past they had become undone or uncoiled. After many years of discharging containers with similar cords, it is entirely reasonable for the vessel to rely on the Stevedore to safely carry out. Plaintiff has also cited to <u>Serbin v. Bora Corp., Ltd.</u>, 96 F.3d 66 (3rd Cir. 1996). However, plaintiff misunderstands the case. In that case, plaintiff was injured by a piece of vessel's equipment, a snatch block, which was used by the vessel's crew to open and close the hatches. That case, involved the active operations duty in view of the fact that it was an area over which the crew retained control over so as to open and close hatch covers during cargo operations. This is distinct from the situation involved in the present case. The present case involves only the turnover duty as the vessel had no control over the cargo containers once discharge began.

C.  **THE VESSEL'S CONTRACTUAL DUTIES**

The plaintiff has also points to the terms of the charter parties under which the vessel was operating to support its argument that owners had contractually accepted certain responsibilities with regard to cargo operations. Plaintiff has then bootstrapped

4

this argument to an exception in <u>Scindia</u>. In which the Supreme Court limited the vessels duty to supervise cargo operations stating, "absent contract provision", positive law, or "custom to the contrary" a vessel has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the Stevedore". Id. at 172. Plaintiff has pointed to a number of charter party causes between the owners, Swan Reefer and Lauritzen and between Lauritzen and Del Monte as providing a contractual basis for holding the vessel owner to have assumed the duty to supervise the cargo operations.

In the first instance, it should be noted that in neither of the charter parties at issue, plaintiff's Exhibit 1 and 2 is there any indication that their terms inure to the benefit of either the Stevedore or, an individual longshoreman. In <u>Derr v. Kawasaki, KK</u>, 835 F.2d 490 (3rd Cir. 1987) plaintiff elicited testimony from an expert that it was customary for the vessels to observe the loading of cargo. The court dismissed this stating:

> Even if it were true that a vessel customarily observed the loading of cargo, understandable in light of its potential liability for certain damaged cargo, <u>see</u> Tulane Note <u>supra</u>, at 1433, we agree with the district court that such observation cannot be used to reimpose the general duty to supervise the Stevedore. Nor can such observation be vaulted into the type of active involvement and control that would trigger the ships liability.

Plaintiff points to a number of <u>Charter Party</u> clauses which essentially acknowledge that the cargo is loaded, stowed and discharged under the Master's supervision and owner's responsibility and moreover that owners are to provide an officer during cargo operations to (1) prevent pilferage or misconduct to the cargo; and

(2) watch and secure proper handling or stowage of the cargo. In <u>Carpenter v. Universal Star Shipping, S.A.</u>, 924 F.2d 1539 (9th Cir. 1991) the 9th Circuit Court addressed an almost identical clause in connection with a vessel under time charter. The court was construed a time charter clauses that provided in relevant part as follows:

> "Stevedore's when required, shall be employed and paid
> for charters, but this shall not relieve owners from
> responsibility at all times for proper stowage, which must
> be controlled by the Master, who shall keep a strict account
> of all cargo loaded and discharged."

<u>Id</u>. at 1545.

The Court in <u>Carpenter</u> held that the charter party clauses, similar to those cited by plaintiff, determine the indemnity issues between owners and charterers and do not inure to the benefit of longshoreman. Id. at 1545. As the Court in <u>Carpenter</u> further cited <u>Scindia</u> as recognizing that a contract between the Stevedore and the ship owner may affect the duty the owner owes. <u>Scindia</u>, 451 U.S. at 176 note 23, 101 S.C. at 1626. The <u>Carpenter</u> Court explained: "Likewise, [the clause] of the time charter contract operates as a risk shifting provision between the time charterer and [the vessel owner]. However, neither clause creates a duty to intervene to insure longshoreman safety during cargo loading." Id. at 1545. Specifically, the Court in <u>Carpenter</u> held that such charter party terms are not relevant to the duty owed by a vessel to a longshoreman. Id. at 1545.

The charter party provisions referred to by plaintiff do no more than provide a risk shifting provision for cargo damage or expense. No mention is made in any of the charter party clauses concerning the safety of longshoreman. Rather, the focus of the clauses is directed exclusively at the safety of the cargo and thus provides a basis for dividing liabilities in the event of cargo damage.

6

In <u>Celestine v. Lykes Brothers Steamship Co., Inc.</u>, 729 F. Supp. 691 (N.D. Calif. 1989) plaintiff argued that the turnover duty under <u>Scindia</u> was broadened by the charter party between the Military Sea Lift command and owners. In that case, the relevant clause is as follows:

> Cargo shall be loaded, stowed, trimmed, secured, and discharged by the charterer, the Master's supervision and the Master shall be responsible for such activity as it pertains to the sea worthiness of the vessel.

<u>Id</u>. at 694.

The Plaintiff in <u>Celestine</u> relied on the language of <u>Scindia</u> that indicated a contract provision might alter ship owners duties. However, the Court in Celestine never the less held that the terms of the charter party failed to raise a genuine issue of material fact as to the existence of such contract or custom. <u>Id</u>. at 694. Similar to <u>Celestine</u>, plaintiff in this case has provided no evidence that this provision was intended by any of the parties involved in the various charter parties to alter the obligations of the vessel toward longshoreman. In a similar case, <u>La Martina v. Pan Ocean Shipping</u> 815 F. Supp. 878 (D. Md. 1992) plaintiff argued that the existence of a custom created factual basis for taking the case outside of <u>Scindia</u>. A plaintiff was injured when he slipped on oil on the deck of an automobile carrier. Plaintiff argued that it was a custom and practice of the port for crew members for car ships to keep themselves apprised of the condition of the deck and as discharge progressed, to place absorbent materials on slippery spots.

The court declined to hold that such a custom would take the case outside the ruling in <u>Scindia</u> stating:

> The flaw with plaintiff's argument is their assumption a custom generated duty to supervise or inspect somehow

> operates to transfer a duty to the ship owner to eradicate dangers reasonably known to or managed by the Stevedore."

Id. at 880, 881.

The charter party terms in the present case, boiled down to their bare essence imposes on the vessel vis' a vis' the charterer a duty to oversee cargo operations so as to allow allocation of costs or damages arising out of cargo damage. None of the relevant clauses requires vessel owner to interfere with the operations of the Stevedore. The claused do not benefit the stevedore or its longshoreman, neither of whom are signatories to the charters. Accordingly, the charter party terms do nothing to alter the vessels obligations under Scindia.

For these reasons, Defendant's Motion must be granted.


Fox, Rothschild, O'Brien & Frankel, LLP


By:_____
    A. Robert Degen, Esquire
    2000 Market Street, Tenth Floor
    Philadelphia, PA  19103-3291
    (215) 299-2085


Dated:

## CERTIFICATE OF SERVICE

I hereby certify that service of a true and correct copy of the Reply of Swan Reever I A/S to Plaintiff's Opposition to Defendants' Motion for Summary Judgment has been served upon counsel listed below on the 24th day February, 2003 by United States Mail, postage prepaid.

E. Alfred Smith, Esquire
1333 Race Street, 2nd Floor
Philadelphia, PA 19107
Attorney for Plaintiff


Robert Fine, Esquire
Fine & Stoud
1333 Race Street
Philadelphia, PA 19107

_____

A. ROBERT DEGEN, ESQUIRE

PH1 471766v1 02/24/03