**IN THE UNITED STATES  DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

STEPHEN MANKUS                          :
                          Plaintiff,     :
                                         :
          v.                             :          NO.  02-3425
                                         :
SWAN REEFER I A/S                        :
                          Defendant.     :

**SUPPLEMENTAL BRIEF OF DEFENDANT SWAN REFER I A/S**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**I.      Introduction**

          In response to defendant's Motion for Summary Judgment, plaintiff Stephen

Mankus has asserted that the "active operations" duty is applicable to this case and, regardless of

which duty is at issue, the obviousness of the alleged hazard is a question for the jury.  In this

case, however, the plaintiff was allegedly injured due to a hazard involving the cargo (not a

hazard involving the condition of the ship or its equipment), the cargo condition that allegedly

caused the accident was open and obvious (the stevedore and the plaintiff had actual knowledge

that electrical cords were hanging a short distance below the containers stowed on the third tier),

and there is no dispute that the ship had been turned over to the stevedore for cargo operations.

Under these circumstances, the "active operations duty" simply does not apply.  Furthermore,

under the clear, controlling caselaw that defines a vessel's "turnover duty," a vessel owner

cannot be held liable for an accident caused by an open and obvious cargo condition; as a matter

of law, a vessel owner is entitled to rely on an expert stevedore to identify and cope with

potential cargo hazards.

          The United States Supreme Court and The Third Circuit Court of Appeals

have held that, when analyzing the duty of care owed by a vessel owner, "the cargo stow is

separate and distinct from other aspects of the ship."  Howlett v. Birkdale Shipping Co., S.A.,

512 U.S. 92, 104 (1994); see also Derr v. Kawasaki Kisen K.K., 835 F.2d 490 (3d Cir. 1987),

cert denied, 486 U.S. 1007 (1988).  This is so because "shipowners engage a stevedore for its

expertise in cargo operations and are entitled to assume that a competent stevedore will be able

to identify and cope with defects in the stow." <u>Howlett</u>, 512 U.S. at 104; <u>see also</u> <u>Kirsch v. Plovidba</u>, 971 F.2d 1026, 1029-30(3d Cir. 1992) ("certain dangers that may be hazardous to unskilled persons **need not be remedied** if an expert and experienced stevedore could safely work around them.")  Therefore, in <u>Howlett</u>, the Supreme Court held that a vessel owner does not have a duty to conduct inspections to identify cargo hazards and a vessel does not have a duty to warn a stevedore about cargo hazards that would be apparent to a competent stevedore. <u>Howlett</u>, 512 U.S. at 104.  The Supreme Court noted that any cargo hazard recognized by a member of the crew would be apparent to a stevedore that is "reasonably competent in the performance of his work" and "[s]ubjecting vessels to suit for injuries that could be anticipated by a competent stevedore would threaten to upset the balance Congress was careful to strike in enacting the 1972 Amendments [to the Longshore Harbor Workers' Compensation Act.]" <u>Id.</u> at 97.  In particular, the 1972 Amendments were enacted "to shift more of the responsibility for compensating injured longshoremen to the party best able to prevent injuries: the stevedore-employer." <u>Id.</u>

The theories of liability proposed by plaintiff Stephen Mankus, if adopted, would undermine the goals of the 1972 Amendments and they are inconsistent with the decisions issued by the Supreme Court and the Third Circuit Court of Appeals that place responsibility on the stevedore for identifying and addressing cargo hazards.  Also, any ruling that imposes liability on a vessel owner for failing to remedy an open and obvious cargo hazard would be a case of first impression.  Therefore, defendant felt it was important to submit this Supplemental Brief to emphasize the clear distinction that must be drawn between cargo hazards and other types of hazards when defining a vessel owner's duty of care.

II.    **The Established Law**

A.    **The Duties Owed By a Vessel Owner**

In 1972, Congress enacted several important Amendments to the Longshore & Harbor Workers Compensation Act.  The Amendments represented a carefully constructed compromise that balanced the interests of longshoremen, stevedores and shipowners:

> A tradeoff was made by Congress in an attempt to balance the interests of all parties involved.  Under the plan as formulated by Congress, the longshoreman lost his claim against the vessel under the warranty of seaworthiness allowed by Sieracki, and in return was granted much higher compensation benefits.  The stevedoring company that employs the longshoreman was forced to pay the higher workmen's compensation benefits, but was relieved of liability from Ryan-type indemnity suits brought by the vessel.  The vessel lost its indemnity rights against the stevedoring company, but had its liability to longshoremen limited to cases where its negligence can be proved.  Act of October 27, 1972, Pub.L. No. 92-576, §18, 86 Stats. 1263, amending 33 U.S.C. §901 et seq. (1970).

Ramirez v. Toko Kaiun K.K., 385 F. Supp. 644, 650 (N.D. Cal. 1974); see also Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 262 (1979) ("Congress acted in 1972, among other things, to eliminate the shipowner's liability to the longshoreman for unseaworthiness..."); Munoz v. Flota Merchante Grancolumbiana, S.A., 553 F.2d 837, 839 (2d Cir. 1977) ("Congress, by its extensive overhaul of the LHWCA in 1972, sought to achieve several goals:  adequate, increased and sure compensation for injured longshoremen, elimination of the rubric of liability without fault for shipowners, and encouragement of safety within the industry by placing the duty of care on the party best able to prevent accidents.")

One of the "most controversial and difficult issues" facing Congress concerned "the liability of vessels, as third parties, to pay damages to longshoremen who are injured while engaged in stevedoring operations."  H. R. Rep. No. 92-1441, 92nd Cong., 1st Sess., reprinted in U.S.C.A.N. 4698, 4701-02 (1978) (hereinafter "H.R. Rep-No. 92-1441").  After careful

consideration, Congress enacted section 905(b) of the Amendments, which eliminated a longshoreman's right to bring suit against a vessel owner based on theories of unseaworthiness or a non-delegable duty to provide a safe place to work.  The stated "purpose of [these] amendments [was] to place [a longshoreman] injured aboard a vessel in the same position he would be if he were injured in non-maritime employment ashore, insofar as bringing a third party damage action is concerned, and <u>not</u> to endow him with any special maritime theory of liability or cause of action under whatever judicial nomenclature it may be called, such as 'unseaworthiness', 'non-delegable duty', or the like."  <u>Id.</u> at 4703.  Therefore, while the vessel was to remain liable for "its own negligence," the Committee Reports clearly indicate that Congress did not intend for vessel owners to be held liable "for injuries which are really the fault of the stevedore."  <u>Id.</u> at 4604.

      Although Congress made it clear that shipowners shall only be held liable for their "own negligence," it did not specify the acts or omissions that would constitute negligence.  Instead, Congress left that issue to "be resolved through the application of accepted principles of tort law and the ordinary process of litigation -  just as they are in cases involving alleged negligence by land based third parties."  <u>Id.</u>

      After the 1972 Amendments became law, the lower federal courts reached varying conclusions regarding the construction and application of § 905(b).  In <u>Scindia</u>, therefore, the United States Supreme Court defined the duties that a vessel owner owes to longshoremen who board a vessel to perform cargo operations. <u>Scindia Steam Navigation Co. v. De Loss Santos</u>, 451 U.S.156, 175-76 (1981).  In doing so, the Supreme Court drew a distinction between the duties owed before the vessel is turned over to the stevedore for cargo operations and the vessel owner's obligations after cargo operations have begun.  More importantly for this

case, the Supreme Court also drew a clear distinction between hazards involving the cargo and

hazards involving the ship and its equipment.

The Supreme Court held that, before cargo operations begin, a vessel owner owes

to the stevedore and its longshoremen-employees a duty of "due care" to have the "ship and its

equipment" in a reasonably safe condition and a corollary duty to warn about hidden hazards that

would not be obvious to or anticipated by a reasonably competent stevedore:

> This duty extends at least to exercising ordinary care under the
> circumstances to have the ship and its equipment in such condition
> that an expert and experienced stevedore will be able by the
> exercise of reasonable care to carry on its cargo operations with
> reasonable safety to persons and property, and to warning the
> stevedore of any hazards on the ship or with respect to its
> equipment that are known to the vessel or should be known to it in
> the exercise of reasonable care, that would likely be encountered
> by the stevedore in the course of his cargo operations and that are
> not known by the stevedore and would not be obvious to or
> anticipated by him if reasonably competent in the performance of
> his work.  The shipowner thus has a duty with respect to the
> condition of the ship's gear, equipment, tools, and work space to be
> used in the stevedoring operations; and if he fails at least to warn
> the stevedore of hidden danger which would have been known to
> him in the exercise of reasonable care, he has breached his duty
> and is liable if his negligence causes injury to a longshoreman.

Id. at 166-67 (citations omitted).  The duties established in this passage have been termed the

"turnover duty" and the "duty to warn."  As noted, they define the shipowner's conduct before

cargo operations have begun.  In Scindia, the Supreme Court also defined a vessel owner's duty

of care after the vessel has been turned over to the stevedore for cargo operations:

> We are of the view that absent contract provision, positive
> law, or custom to the contrary ... the shipowner has no general duty
> by way of supervision or inspection to exercise reasonable care to
> discover dangerous conditions that develop within the confines of
> the cargo operations that are assigned to the stevedore.  The
> necessary consequence is that the shipowner is not liable to the
> longshoremen for injuries caused by dangers unknown to the
> owner and about which he had no duty to inform himself.  This
> conclusion is plainly consistent with the congressional intent to
> foreclose the faultless liability of the shipowner based on a theory

of unseaworthiness or nondelegable duty. The shipowner, within limits, *is* entitled to rely on the stevedore, and owes no duty to the longshoremen to inspect or supervise the cargo operations.

. . . .

Yet it is quite possible, it seems to us, that Seattle's judgment in this respect was so obviously improvident that <u>Scindia</u>, if it knew of the defect and that Seattle was continuing to use it, should have realized the winch presented an unreasonable risk of harm to the longshoremen, and that in such circumstances it had a duty to intervene and repair the ship's winch. The same would be true if the defect existed from the outset and Scindia must be deemed to have been aware of is condition.

<u>Id.</u> at 168-69, 172, 175-76.

In <u>Scindia</u>, therefore, the Supreme Court held that a vessel owner does not have a duty to supervise or inspect the cargo operations of an independent stevedore and, generally, a vessel owner cannot be held liable for hazards that arise during the course of the cargo operations, although the Court did leave open the possibility, that a vessel owner may have a "duty to intervene" under very limited circumstances. <u>See</u> <u>Carpenter v. Universal Star Shipping S.A.</u>, 924 F.2d 1539 (9th Cir. 1991), <u>cert.</u> <u>denied</u>, 506 U.S. 955 (1992) (no duty to intervene unless the hazard involves the ship's gear). Finally, the Supreme Court stated that a "vessel may be liable if it actively involves itself in the cargo operations and negligently injures a longshoreman or if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in **areas, or from equipment, under the active control of the vessel during the stevedoring operation.**" <u>Id.</u> at 167 (emphasis added).

The four duties that were recognized by the Supreme Court in <u>Scindia</u> (the "turnover duty," the "duty to warn," the "duty to intervene" and the "active participation duty") were crafted based on an analysis of the roles played by the stevedore and the vessel owner, the expertise of each and the goal of promoting safety. In doing so, the Supreme Court drew a sharp distinction between cargo hazards and other types of hazards.

**B.**     **Cargo – The Expertise of the Stevedore**

Even before the Scindia decision was issued, courts analyzing a vessel owner's duties of care recognized that stevedores are hired for their expertise dealing with cargo hazards. As the First Circuit Court of Appeals pointed out:

> A seagoing ship runs the constant risk of encountering severe weather.  As a result, it is unlikely that cargo, no matter how carefully stowed, will emerge unscathed and unblemished from the journey.  These conditions are known to exist and inhere in the very nature of seaborne commerce.  The stevedore is hired for its expertise in handling cargo, including cargo which arrives from its journey in less than optimal condition. If stowage or the cargo itself represents a risk to the longshoremen, the stevedore normally has the right to remedy the defect, at the expense of the ship (as was done here with the partial remastering performed by the stevedore) or to discontinue unloading operations.

Anderson v. Iceland S.S. Co., 585 F.2d 1142, 1151 (1st Cir. 1978); see also Hugev v. Dampskisaktieselskabet International, 170 F. Supp. 601, 609-10 (S.D.Cal. 1959), aff'd, 274 F.2d 875 (9th Cir.), cert. denied, 363 U.S. 803 (1960).  Other courts also recognized that discharging stevedores are hired for their ability to identify and cope with cargo hazards; see e.g. Citizen v. M/V Triton, 384 F. Supp. 198, 201 (E.D. Tex. 1974) ("The duty to discover and remedy a dangerous condition caused by the space between the bags of flour as stowed was clearly the responsibility of the stevedore which had control of the work being done in the hold...."); Hugev, 170 F. Supp. at 610 ("stevedoring contractors hold themselves out as being trained and equipped to cope with these conditions and these dangers."); Fedison v. Vessel Wislica, 382 F. Supp. 4, 6 (E.D. La. 1974); Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. 355, 366 (1962) ("The petitioner [stevedore] is in the business of handling cargo, and any danger created by the New York bales was at least as apparent to the petitioner as to the respondents.  Under its

warranty the petitioner had a _duty_ to see that the danger was removed before proceeding to unload the Philadelphia cargo.") (emphasis added).

When Congress enacted the 1972 Amendments, one of the goals was to increase safety by providing incentive to the party in the best position to prevent injuries that occur during cargo operations: the expert stevedore. This was accomplished by eliminating the vessel's liability for hazards that fall within the stevedore's area of expertise.

As a result of the 1972 Amendments, longshoremen received a "vast" increase in compensation benefits. _See_ H.R. Rep. No. 92-1441 at 4703. The benefits available to longshoremen now greatly exceed the benefits available in other industries. Prior to the 1972 Amendments, the maximum compensation was $70.00 per week; in 1994, by the time the _Howlett_ decision was issued, the maximum compensation rate was $738.30 per week. An injured longshoreman cannot sue his stevedore-employer to recover any additional sum, but he can recover from a shipowner that is found to be negligent. Out of the longshoreman's recovery from the shipowner, however, the stevedore-employer is entitled to recoup its full compensation lien (33 U.S.C. § 933(g)(3)) and the shipowner is statutorily barred from seeking contribution or indemnity from the "stevedore-employer" under any circumstances (33 U.S.C. § 905(a)(b)). Therefore, if a plaintiff-longshoreman were permitted to recover damages from a vessel owner for an accident arising from a cargo hazard and/or the method of discharge used by stevedore, the stevedore-employer would recover its full lien even though its negligence in failing to identify and address the cargo hazard was the primary or sole cause of the accident. _See_ _Edmonds v. Compagnie Generale Transatlantique_, 443 U.S. 256 (1979). Furthermore, there would be no incentive for the discharging stevedore to initiate and enforce safety procedures pertaining to the discharge of cargo (i.e. the purpose for which the expert stevedore is hired) because the vessel would be held liable for hazards related to the cargo. _See_ _Scindia_, 451 U.S. at

181 (Powell, concurring) ("This would decrease significantly the incentives toward safety of the party in the best position to prevent injuries, and undercut the primary responsibility of that party for ensuring safety.")

Based on these principles, the Supreme Court and the Third Circuit Court of Appeals have held that the duties owed by a vessel owner pertaining to cargo conditions are very limited. In Scindia, the Supreme Court held that a vessel owner's "turnover duty" – i.e. the duty to exercise ordinary care to prepare the ship for discharge operations - is limited to the condition of the "ship and its equipment." In addition, although the Supreme Court concluded that a vessel owner has a duty to warn that may extend to cargo conditions, that duty is limited to warning of hidden dangers that are known to the vessel.

As the Third Circuit Court of Appeals pointed out in Derr, when a cargo hazard is open and obvious there is "no warning that the ship [can give that would add] to the knowledge of a competent stevedore." Derr, at 835 F.2d 496. Furthermore, a basic premise underlying the entire Scindia decision is the principle that stevedores are hired for their expertise in cargo operations, which includes the stevedore's ability and duty to identify and deal with cargo hazards. Therefore, in Derr, the Court of Appeals held that a vessel owner does not have a duty to warn about open and obvious hazards involving the cargo.

Furthermore, in the more recent Howlett decision, the Supreme Court reaffirmed that, when evaluating a vessel owner's duties of care, "the cargo stow is separate and distinct from other aspects of the ship." Howlett, 512 U.S. at 104. Throughout the Howlett decision, the Supreme Court made it clear that "shipowners engage a stevedore for its expertise in cargo operations and are entitled to assume that a competent stevedore will be able to identify and cope with defects in the stow." Id. at 104.

These decisions from the Supreme Court and the Court of Appeals, which hold that "the cargo stow is separate and distinct from other aspects of the ship" when defining a vessel owner's duty of care, are consistent with other maritime cases that address the role of independent contractors.  Under established principles of maritime law, an independent contractor who performs work aboard a shipping vessel may not recover if he is injured by the condition he was hired to repair.  West v. United States, 361 U.S. 118 (1959) (no duty to protect plaintiff from risks inherent in carrying out the contract); Hill v. Texaco, Inc., 674 F.2d 447 (5th Cir. 1982); Peters v. Titan Nav. Co., 857 F.2d 1342 (9th Cir. 1988); Alphin v. Marquesa Maritime, S.A., 747 F. Supp. 1223 (E.D. Tex. 1990); Peters v. Titan Navigation Co., 857 F.2d 1342 (9th Cir. 1988) ("[T]here is no negligence liability when a repairman is injured by the very condition he is hired to repair.")  Therefore, if a vessel owner's liability for longshore accidents is premised on principles of negligence law as Congress intended, and not a special theory of liability, a vessel owner should not be held liable when an accident occurs as a result of an open and obvious cargo hazard – **because the stevedore is hired to identify and remedy those hazards.**

III.    **Active Operations Duty**

In this case, plaintiff contends that the active operations duty is applicable because members of the vessel's crew allegedly created the condition that caused the accident. However, the active operations simply does not apply when the alleged hazard involves a condition of the cargo, even if a member of the crew allegedly created the condition before discharge operations began.

In Davis v. Portline Transportes Maritime Internacional, 16 F.3d 532 (3d Cir. 1994), in an opinion authored by Judge Edward Becker, the Third Circuit Court of Appeals

detailed the "contours of the active operations duty." Id. at p. 539. This extended discussion was warranted because, before Davis, the "active operations" duty received very little attention in the caselaw; instead, most cases were analyzed under the "turnover duty" and/or the "duty to intervene." Therefore, the decision in Davis is significant because it was the first decision in this Circuit – or any circuit - to analyze the application of the "active operations" duty. It is important to note that Judge Becker specifically drafted the "control/charge component" of the "active operations" duty in such a way **"to ensure . . . that the active operations duty does not supplant the turnover duty/duty to warn and duty to intervene in areas under the stevedore's control." Id. at 541** (emphasis added). Therefore, the active operations duty is not a mechanism for imposing liability simply because liability is foreclosed under the other duties, which is exactly what plaintiff is attempting to do in the present case.

    To fully understand the application and scope of the active operations duty, an analysis must be conducted of the Third Circuit's decisions in Kirsch (which preceded Davis and also was authored by Becker), the Davis decision itself, and the subsequent opinion of the Third Circuit in Serbin, another opinion authored by Judge Beck. A review of these cases demonstrates that the "active operations" duty does not become applicable simply because a member of the crew may have created the alleged cargo hazard before cargo operations began.

### A.    **Kirsch**

    In Kirsch, the stevedore-employer was hired to load cargo containers aboard a vessel. When plaintiff and the other longshoremen entered the No. 4 hold it "was empty, but they discovered a thin coating of oil covering a substantial portion of the deck of the hold." Kirsch, 971 F.2d at 1027. For the purposes of the defendant's summary judgment motion, the Court accepted that "members of the crew were or should have been aware of the oil [and]... the presence of the oil was the shipowner's responsibility," i.e. a member of the vessel's crew may have created the condition. Id. at 1029. Therefore, the issue before the Court of Appeals was

whether "a shipowner breaches its basic duty to provide safe working conditions by turning over a ship with an obvious hazard." Id. at 1029.

> The panel in Kirsch began its analysis by setting forth the following discussion:

> A shipowner will not ordinarily be liable to a longshore worker injured by an obvious hazard because the shipowner's duty is only to provide a workplace where skilled longshore workers can operate safely. The basic theme of the Supreme Court's decision in Scindia is that "[a]s a general matter, the shipowner may rely on the stevedore to avoid exposing the longshoremen to unreasonable hazards." 451 U.S. at 170, 101 S.Ct. at 1623. Scindia "plac[es] the primary burden on the stevedore for avoiding injuries caused by obvious hazards." Id. at 180, 101 S.Ct. at 1628 (Powell concurring). . . .

> Thus, where a danger is obvious but easily avoidable, the shipowner will not be liable for negligence.

Id. at 1030.

> In Kirsch, the obviousness of the condition that caused the longshoremen's accident was not in dispute. Therefore, the Court of Appeals moved on to consider whether "the stevedore, . . . and its longshore employees could have, in a practical manner, avoided the danger. . . ." Id . The Court concluded that the longshoreman could **not** "avoid the danger" since they "could not have crossed the hold without trekking through the oil." Id. The stevedore, however, "had another option - to eliminate the obvious hazard by treating or cleaning up the oil slick themselves or by telling the ship's crew to do so." Id. After reviewing the facts, the panel determined that the plaintiff presented "insufficient evidence that [the shipowner] should not have assumed that [the stevedore] and its employees would avoid the obvious danger that the spill allegedly presented," i.e. plaintiff failed to present evidence indicating that the vessel owner could not reasonably rely on the stevedore (and its longshore employees) to avoid or remedy the hazard or stop working in the area until the problem was resolved. Id.

"Accordingly, [the shipowner] was not negligent and the district court's award of summary judgment to the shipowner [was] affirmed."  Id.

In Kirsch, Circuit Judge Becker expressed concern that absolving a shipowner of liability for an open and obvious condition "is similar to the result under the outmoded common law tort doctrines of contributory negligence and assumption of risk, doctrines that Congress rejected in 1972."  Kirsch, 971 F.2d at 1031 n.6.  Judge Becker expressed some dissatisfaction with the Restatement view which "justif[ies] the no-recovery result. . . as a duty question."  Id. Judge Becker noted, however, that "the result is easier to accept when one recognizes that we deal here with a liability triangle that also includes the stevedore, **upon whose expertise in cargo operations, the Supreme Court has emphasized, the shipowner may ordinarily rely.**" Id.  (emphasis added).

As this discussion demonstrates, in Kirsch, Judge Becker concluded that if there is an open and obvious hazard aboard a vessel that falls within the scope of the stevedore's area of expertise (i.e. cargo operations), the open and obvious nature of the hazard does **not** raise the issue of comparative fault.  Instead, the vessel owner **does not have a duty** to remedy or warn about the condition because it can rely on the stevedore to avoid or remedy the hazard or stop working until the problem is resolved.

In Davis, when he outlined the "contours of the active operations duty, Judge Becker again confirmed that a vessel owner does **not have a duty** to remedy or warn about conditions that fall within the stevedore's area of expertise, i.e. cargo operations.  In Davis, however, the situation was different because the alleged hazard did not involve cargo or cargo operations, and involved a hazard created by the ship's crew **after** discharge operations had begun.

### B.    Davis

In <u>Davis</u>, the vessel was docked at a cement pier in Philadelphia and, as a result of the discharge operations, there was cement dust covering the main deck.  There was evidence presented that a crewmember hosed down the deck with water in sub-freezing weather to remove the cement dust while the plaintiff-longshoreman's back was turned.  Furthermore, the panel found that "there was evidence that the spot where Davis fell was hidden, as it was covered by cement dust, the air was laden with cement dust, and the lighting condition was poor and, moreover, that Davis' body may have been positioned between the light and the defect ... further obscuring the hazardous condition from view."  <u>Davis</u>, 16 F.3d at 539.  As a result of these conditions, the plaintiff-longshoreman slipped and fell on the main deck as he was attempting to depart the vessel.

"The gravamen of Davis' claim [was] that [the vessel owner] breached its active operations duty because the second mate's hosing down of the deck created a non-obvious hazard which breach proximately caused his injury."  <u>Id.</u>  It was not argued in <u>Davis</u> that the vessel owner actively supervised or directed the cargo operations of the stevedore, which would implicate the active operations duty.  Instead, the plaintiff argued that the vessel retained active control over a piece of the ship's equipment (i.e. the snatch block) during the discharge operation.  In a lengthy decision, the Court of Appeals held that since the plaintiff-longshoreman was alleging a breach of the active operations duty, the open and obvious nature of the condition would not provide the vessel with a complete defense.  The rationale for that decision was explained in the following paragraphs:

> [D]uring stevedoring operations, the vessel **properly relies on the experience and expertise of the stevedore to load or unload cargo safely, for this experience and expertise is the precise reason why a vessel hires a the stevedore, and hence it must not supervise the stevedore.  *Cf. Scindia*, 451 U.S. at 171-72, 101**

**S.Ct. at 1624.  The vessel, then, may generally assume that the stevedore is an expert and safety-conscious, correspondingly <u>reducing the vessel's duties</u> toward longshore workers.**  Should the stevedore fail to live up to its responsibility to protect its workers during stevedoring operations, the Act's compensation scheme forced it to pay the price.

When, however, the hazard occurs due to the vessel's active operations, as is plausibly the case here, it no longer is proper for the vessel to defer to the stevedore's expertise in handling cargo. The problem of apportioning responsibility between the vessel and stevedore by manipulating the vessel's standard of care to account for both entities disappears, because the vessel is in such events responsible for the injury, and liability, if any, should attach to it according to its comparative fault.  It patently is not the stevedore's responsibility to protect the worker against the vessel's active operations.  That, quite simply, is the vessel's duty.  Congress was not ambiguous when it repeatedly pronounced that a vessel's liability should be premised on its own negligence as garnered from land-based third party tort doctrines.  In short, **unlike with the turnover duty which generally applies to hidden defects in cargo areas**, the vessel cannot rely on the stevedore's expertise to protect its workers from vessel's active operations.  This much we believe the Court recognized in <u>Scindia</u>, and the corresponding duty enumerated (but did not develop) for these situations is the active operations duty.

<u>Davis</u>, 16 F.3d at 548 (emphasis added).

In this passage, the <u>Davis</u> panel confirmed that the vessel ordinarily does not have a **duty** of care to remedy open and obvious conditions involving the cargo because it can rely on the expertise of the stevedore.  <u>Id.</u>  The <u>Davis</u> court held that if a longshoreman is injured by the active negligence of the vessel (such as a crewmember hosing down a deck on a cold night), in an area outside the scope of the stevedore's expertise, then the active operations duty applies and the open and obvious nature of the condition becomes a question of comparative fault.  Also, the active operation duty would apply if the vessel actively supervised or directed the cargo operations of the stevedore.  However, in <u>Davis</u>, the Court of Appeals did not weaken or qualify the vessel owner's ability to rely on the stevedore to identify and address cargo hazards.

In Howlett, which was issued after Davis, the United States Supreme Court once again addressed the shipowner/stevedore relationship when a condition of the cargo stow is involved.  Throughout its opinion, the Supreme Court stressed that the stevedore is presumed to be an expert in cargo handling and cargo operations.  Thus, the Court recognized that the stevedore "is in the best position to avoid accidents during cargo operations and that the shipowner can rely on the stevedore's warranty to perform competently." Howlett, 512 U.S. at 101 (citations omitted).  Furthermore, the Court stated that **"[t]he stevedore's obligations in this regard may not be diminished by transferring them to the vessel."** Id. (emphasis added).

C.    **Serbin**

In Serbin v. Bora Corp., 96 F.3d 66 (3d Cir. 1966) Judge Becker discussed the active operations duty for a second time.  In Serbin, the plaintiff-longshoreman was injured while trying to lift a "snatch block" from a horizontal to a vertical position.  The vessel involved in Serbin had five "tween" decks, each of which had a hatch cover.  After each deck was cleared of cargo by the longshoremen, members of the vessel's crew entered the hatch to open the next "tween deck."  The tween decks were opened and closed by means of a block and pulley system; a cable wire passed through several "snatch blocks" that were attached to the deck and the end of the cable wire was attached to a crane.  As the crane pulled up on the cable wire, the tween deck folded back and exposed the cargo in the next deck.

In order to open the tween deck, the snatch blocks had to be in a horizontal or "down" position.  However, once the deck lid had been opened, the blocks had to be returned to a vertical or "up" position so the cargo below could be discharged.  It was the responsibility of

the crew to lift the snatch blocks while cargo operations were proceeding.  However, the plaintiff in <u>Serbin</u> was injured when he tried to lift one of the snatch blocks himself, while standing on top of the cargo.  The plaintiff allegedly did not know that there was an obstruction that prevented the block from being lifted and, when he tried to pry up the block with a piece of wood, he was catapulted off the cargo to the deck below.  <u>Id.</u> at 69.

In <u>Serbin</u>, Judge Becker concluded that it was a jury question as to whether the turnover duty or the active operations duty controlled the vessel owner's duty of care.  This was so because the plaintiff-longshoreman introduced evidence that the hatch blocks – an instrumentality of the ship – "remained at all times under the control of the crew" because it was the crew's responsibility to lift the blocks <u>during</u> the cargo operations.  Therefore, in <u>Serbin</u>, the Court of Appeals held that if a vessel retains active control over a piece of ship's equipment during the cargo operations, the active operations duty may apply.  Again, however, the Court of Appeals did not weaken or qualify the vessel owner's ability to rely on the expert stevedore to identify and address cargo hazards.

In <u>Serbin</u>, because there was a question of fact as to which duty applied, the Court of Appeals analyzed the case under the active operations duty.  Furthermore, consistent with its holding in <u>Davis</u>, the Court of Appeals concluded that the open and obvious nature of the hazard created a question of comparative negligence.  The Court of Appeals specifically noted, however, that **"obviousness [is] a bar to liability under the turnover duty."**  <u>Id.</u> at 75.

## IV.    <u>The Active Operations Duty Does Not Apply To The Case</u>

In this case, the plaintiff was not injured due to a hazard involving the ship or its equipment.  Instead, plaintiff contends that he was injured due to the condition of the cargo that was being discharged (i.e. the refrigerated containers) and there is no question that the stevedore

was in control of the discharge operation.  Therefore, the active operations duty simply does not apply.

In response to defendant's Summary Judgment Motion, plaintiff argues that the cords attached to the containers remained under the control of the shipowner because the Chief Mate allegedly complained to crewmembers that they "should put the cords away."  See Plaintiff's Opposition at ¶41.  However, unlike Serbin, the alleged hazard did not involve the condition of the ship or its equipment.  Equally important, unlike the situations in Serbin and Davis, the crew did not exercise ongoing control of the containers or the electrical cords after discharge operations began.  Prior to arrival, the vessel's crew had prepared the containers for discharge by bundling the cords and then turned over the containers to the expert stevedore for discharge operations.  As a matter of law, the vessel could rely on the expert stevedore to identify any hazards presented by the open and obvious condition of the hanging cords, to avoid or remedy those hazards and/or to stop work in the area until the problem was resolved.

Every single witness has admitted that the stevedore and its employees knew prior to discharging the cargo containers that the electrical cords on the reefer containers stowed in the third tier of the cargo containers at the No. 2 hatch of the TUNDRA TRADER were tied and bundled up, but had not been placed in the "pockets" of the cargo containers.  All of the stevedore's supervisory personnel felt that it was safe to discharge the cargo containers in this condition and chose to do so without taking or requiring any remedial action regarding the cords.  Stevedore ship boss William Collins testified that he noticed the manner in which the courts were bundled when he did his "walk around" prior to the start of discharge operations:

> Q.    Now, when did your inspection before the start of discharge operations on
>        February 12, that morning, when you walked around, did you notice the
>        cords were hanging down on some of the third tier containers—
>
> .     A.    Yes, I did.

Q.     --bundled up?  Yes, you did?

A.     The ones that I could see, yes.

Q.     And that, as you said earlier, didn't concern you at the time?

A.     No.

(Dep. of Collins, p. 58).

Ship boss Collins further testified that cords had been stowed in this manner for the preceding 4-5 years (Dep. of Collins, pp. 65-66), and that he felt the stevedore could safely discharge the containers:

Q.     Did you feel that you could safely discharge the ship, discharge those containers with the cords like that?

A.     Yes, I felt we could, because we did it before.

(Dep. of Collins, p. 65).

Likewise, stevedore gang boss Edward Lamb testified that he was aware of the manner in which cords were bundled but hanging down, and did not consider it a danger or hazard:

Q.     But you felt as an experienced longshoreman, that you would be able to safely get those containers off the way they were?

A.     The way they were situated at the beginning—

Q.     Right.

A.     --with the cords first.

Q.     So you did feel that you could safely do the job?

A.     Yes.

(See Dep. of Lamb at pp. 89-90).

Also, crane operator Alex Braun testified that this was the normal manner in which the cords on the reefer units were bundled and that the stevedore routinely discharged the containers in this condition:

A.     They looked like they always do on each vessel that comes into the port.

Q.     What is that?  What does that mean?

A.     The—the crew unplugs them and they coiled them up, tied them up.  And there's a little bit hanging down off of each container.

Q.     When you say "hanging down," about how far from the bottom of the container would it hang?

A.     I would say maybe like three, four feet.

Q.     You observed that as you went on the ship that day?

A.     Yes.

Q.     And that didn't strike you as unusual?

A.     No.

Q.     Had you discharged containers like that before?

A.     Yes.

Q.     Many times?

A.     Each time that I was on that ship, that's the way they are set up.

Q.     Did all of them have cords like that or just a few of them?

A.     Just the – the reefer units.  Sometimes they have dry boxes, which doesn't have the reefer unit on it.  But all of the reefers looked alike.  And they was all coiled up and hanging out about three, four feet.

(See Dep. of Braun, pp. 14-15).

The ship's crew had no reason to expect that the cords on the containers, bundled in the manner they were, would present an "unreasonable risk" of harm to experienced longshoremen; the stevedore itself did not think the cords stowed in this manner would present **any** risk of harm and it is the stevedore, as a matter of law, who is the expert with regard to cargo operations. When the alleged "cargo hazard" is open and obvious, as it admittedly was in this situation, there is "no warning that the ship [can give that would add] to the knowledge of a competent stevedore." Derr, 835 F.2d at 496.

If plaintiff's arguments were accepted and the active operations duty were deemed applicable every time it was arguable that the vessel's activities created a cargo hazard, then the vessel would once again be saddled with a non-delegable duty to provide a safe place to work. Under that scenario, the ship could no longer rely on the expertise of the stevedore to identify and address cargo hazards because the obviousness of the condition would become a question of comparative fault and the vessel could be held liable even though the stevedore's negligence in failing to identify and remedy the hazard was the primary or sole cause of the accident. This, of course, would be directly at odds with Scindia, Howlett and every other decision cited in the parties' briefs, all of which are premised on the principle that a vessel owner is entitled to rely on an expert stevedore to identify and cope with cargo problems. Therefore, in this case, the active operations duty simply does not apply.[1]

---

[1]The instant case involves an alleged hazard with the cargo the vessel was carrying which, as Judger Becker specifically noted in Davis, is a matter within the particular expertise of the stevedore. However, even in the Scindia and Kirsch cases, which involved dangers or hazards arising from the condition of the vessel itself, created by the vessel's crew prior to the start of the stevedore's discharge operation, the shipowner was relieved of any liability because the conditions were open and obvious and the vessel had no reason to anticipate that it could not reasonably rely on the stevedore to avoid or remedy the hazards or stop working until the problems were solved. As such, it is clear that in a case involving a condition of the cargo,

## V.  **No Breach of Turnover Duty**

As discussed above, as a matter of law, a vessel owner cannot  be held liable based on an alleged breach of the turnover duty if the plaintiff was injured by a cargo hazard that was open and obvious.  In Howlett, the Supreme Court reaffirmed that "there can be no recovery under §5(b) for a vessel's failure to warn of dangers that would be apparent to a longshoreman of reasonable competence."  Howlett, 512 U.S. at 104, citing Scindia, 451 U.S. at 167.  Therefore, in this case plaintiff Stephen Mankus cannot establish a breach of the "turnover duty."

There is no question that "hanging cords" were an open and obvious condition since the stevedore and the plaintiff had actual knowledge that the cords were hanging a short distance below the containers.  Recognizing this problem in his case, plaintiff speculates that the accident occurred because of "the latent condition of the defective or poorly tied rope or string which broke . . ."  See Plaintiff's Memorandum at p. 9.  However, there is simply no evidence to support a conclusion that the string used to tie the cord in question was poorly tied or somehow defective.  In fact, plaintiff admits as much since he qualified his argument by stating that the string "broke or came undone" without explaining how it came undone.

In this case, there is no evidence of any latent or hidden hazard **that was known to the vessel** and plaintiff cannot create an issue of fact by raising speculative arguments. Therefore, since the condition was open and obvious, the vessel owner did not have a duty to warn as a matter of law.

---

allegedly created by the ship's crew prior to the start of discharge, the shipowner cannot have any liability.

## VI.    __Conclusion__

       Based upon the foregoing, defendant Swan Reefer I, A.S. respectfully requests that this Court grant its Motion and enter Summary Judgment in its favor.

RAWLE & HENDERSON LLP

By:_____
        Carl D. Buchholz, III
        Michael P. Zipfel
        Attorneys for Defendant,
        Swan Reefer I A/S

        The Widener Building
        One South Penn Square
        Philadelphia, PA   19107
        (215) 575-4200

Dated:  May 14, 2003

## <u>CERTIFICATE OF SERVICE</u>

I, Michael P. Zipfel, Esquire, do hereby certify that a copy of the foregoing Offer of

Judgment has been served via first class mail, postage pre-paid to the following of record:

> Alfred Smith, Esquire
> Alfred Smith & Associates
> 1333 Race Street, 2nd Floor
> Philadelphia, PA 19107
> **(Attorneys for Plaintiff Stephen Mankus)**

> A. Robert Degen, Esquire
> FOX, ROTHSCHILD, O'BRIEN & FRANKEL
> 2000 Market Street, Tenth Floor
> Philadelphia, PA 19103-3291
> **(Attorneys for Defendant Swan Reefer I A.S.)**

_____

Carl D. Buchholz, III, Esquire

Dated:  May 14, 2003