## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEPHEN MANKUS, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION |
| | : | |
| SWAN REEFER I, | : | NO. 02-3425 |
| Defendant. | : | |
| | : | |

## Memorandum and Order

YOHN, J.                                                    May _____, 2003

Stephen Mankus ("plaintiff") is suing Swan Reefer I ("defendant" or "shipowner") for negligence pursuant to the Longshore and Harbor Workers' Compensation Act. Presently pending before the court is defendant's motion for summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure. For the reasons that follow, I will deny defendant's motion.

### BACKGROUND

The following facts are undisputed. Defendant is the owner of the Merchant Vessel ("M/V") Tundra Trader. Pl. Ans. to Def. F. ¶ 1. During the time period relevant to this action, defendant chartered the M/V Tundra Trader to Lauritzen Reefers A/S, which in turn sub-chartered it to Del Monte Fresh Produce International, Inc. ("Del Monte"). Pl. Stmt. of F. ¶ 1.[1] The M/V Tundra Trader was involved in regular weekly trade from Costa Rica to Camden, New Jersey. Pl. Ans. to Def. F. ¶ 5.

At the time of the accident in question, plaintiff was employed as a longshoreman by the

_____

[1] These two organizations were originally named co-defendants in this action. They were subsequently terminated as defendants based upon stipulations of dismissal.

1

Delaware River Stevedores ("DSR"). *Id.* ¶ 3. Prior to the day of the accident involving plaintiff, DRS had discharged the M/V Tundra Trader many times. *Id.* ¶ 6. On such occasions, the DRS ship foreman was William Collins, and plaintiff's direct supervisor during these stevedoring operations was hatch boss Edward Lamb. *Id.* ¶¶ 4 & 6.

DRS was scheduled to discharge the M/V Tundra Trader on February 12, 2001 at 8:00 a.m. The ship's cargo consisted of refrigerated containers with attached electrical cords. These electrical cords measured approximately 50 feet in length. Pl. Stmt. of F. ¶ 52. According to the ship captain, Olexander Tsymbalyuk, to prepare the ship for the stevedoring operation, the crew was ordered to unplug the refrigerated cargo containers and place the attached electrical cords into the containers' recesses. *Id.* This was the crew's responsibility pursuant to the charter between the shipowner and the charterer, and eventually the subcharterer, Del Monte. Pl. Ex. 1 (Head Charter, Addend. 6) at ¶ 4. The chief mate presented a Notice of Readiness[2] to Captain Tsymbalyuk and reported that all the cords had been disconnected and the cargo was ready for discharge. *Id.* ¶ 13.

Prior to discharge, DRS ship foreman Collins inspected the vessel to determine if the longshore workers would be able to safely unload the cargo. *Id.* ¶ 8. As ship foreman, Collins had the authority and responsibility to prevent the stevedoring operation if conditions were unsafe for discharge. Pl. Ans. to Def. F. ¶ 11. Upon inspection, Collins discovered the following.

The refrigerated containers were stowed on three tiers. Pl. Stmt. of F. ¶ 55. The electrical cords attached to the containers on the first and second tiers were properly stowed in the containers' recesses; however, the cords from the highest third tier were simply bundled, or tied, with a piece of rope and were hanging out of the containers approximately four to five feet, despite the captain's order and the Notice of Readiness. *Id.* ¶ 34. In his deposition, Captain Tsymbalyuk admitted that

---

[2] This notice was required under the applicable charter. Pl. Stmt. of F. ¶14.

such a condition was dangerous to longshore workers charged with the responsibility of unloading the cargo.  Pl. Ex. 4 (Dep. of Tsyambalyuk) at 100-01.

Collins testified that this condition was one he had encountered many times before when discharging the M/V Tundra Trader.  Pl. Stmt. of F. ¶ 34.  He further explained that every time DRS found the cords in this condition, he asked the ship's chief to have the crew put them away, and the response was always that the crew could not "get up there to do that."  *Id.* ¶ 36.  Collins did not believe that the condition, consisting of the containers' cords hanging down, was so hazardous that his team could not discharge the cargo safely by employing extra time and substantial caution.  *Id.* ¶ 37.  Hatch boss Lamb stated at his deposition that he was of the same opinion.  Def. Stmt. of F. 12.

Shortly after 8:00 a.m., the longshore workers began unloading the cargo.  Plaintiff began unlocking the containers on the third tier using a metal unlocking pole, which was about 18-20 feet in length and had an S-shaped piece of metal on one of its ends.  Pl. Stmt. of F. ¶¶ 50, 58.  He then watched to ensure that the locks functioned properly while the containers were discharged.  *Id.* Each container was lifted from its stowage place on the offshore side of the vessel and then swung over the vessel toward the inshore side where it was lowered to the pier and disconnected from the crane.  *Id.* ¶ 54.  At one point during the discharge, hatch boss Lamb yelled to three crew members who were sitting within sight, and asked them to put the cords in the recesses of their respective containers, as should have been completed prior to the stevedoring operation.  As on previous occasions with this vessel, the crew responded that they did not have ladders high enough. *Id.* ¶ 41.  The longshore workers were able to discharge, without major incident, ten to eleven containers from the third tier which had cords bundled but hanging down outside and below the container approximately four to five feet. *Id.* ¶ 44.

At approximately 9:20 a.m., after one of the third tier containers had been lifted by the crane,

its hanging electrical cord became unbundled.  Pl. Stmt. of F. ¶ 55.  Ship foreman Collins had

occasionally seen cords become unbundled.  *Id.* ¶ 44.  The only way to communicate to the crane

operator that the cord had become unbundled was by hand signal.  Pl. Ans. to Def. F. ¶ 18.  Ship

foreman Collins attempted to do precisely this but lost sight of him.  *Id.* ¶ 19.  Consequently, while

discharging this container, the crane operator could see neither the cord nor anyone attempting to

signal him.  *Id.* ¶ 20.  Plaintiff saw the long cord extending down its full length, so he grasped his

pole in order to guide the cord so that it would not catch on anything in its path as the crane moved

it toward the shore.  Pl. Stmt. of F. ¶ 55.

After plaintiff successfully guided the cord to the inshore side, the cord got caught at the end

of his pole.  Pl. Stmt. of F. ¶ 56.  As a result, the pole was pulled from plaintiff's hands, struck

another container, bounced back, and struck him in the face.  *Id.*  Although plaintiff had not seen

how the pole was pulled from his hands, Collins explained that the cord had gone through the

unlocking pole until the plug got caught, presumably on the S-shaped piece, which caused it to be

yanked from plaintiff's grasp as the container was moved.  *Id.* ¶ 57.

According to plaintiff, he suffered and will continue to suffer from, injuries to his head,

neck, brain, eye, back, arms, and legs, including diplopia,[3] blurred vision, severe nausea, headaches,

cognitive deficits, psychiatric and emotional problems.  Am. Compl. ¶ 13.  He has also asserted that

he has experienced, and will continue to experience, loss of earnings and earning capacity.  *Id.*

## STANDARD OF REVIEW

Either party to a lawsuit may file a motion for summary judgment, and it will be granted

only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

---

[3]  "The condition in which a single object appears as two objects.  Also called 'double vision.'" MedicineNet's Medterms Medical Dictionary, *available at* http://www.medicinenet.com (last visited May 9, 2003).

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Lebatt, LTD.*, 90 F.3d 737, 743 (3d Cir. 1996) (citation omitted). In addition, "[s]ummary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy*, 90 F.3d at 744 (citation omitted). While the moving party bears the initial burden of showing that there is no genuine issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," *Id.* at 322.

When a court evaluates a motion for summary judgment, "[t]he evidence of the non-movant is to be believed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Additionally, "all justifiable inferences are to be drawn in [the non-movant's] favor." *Id.* At the same time, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990). The non-movant must show more than "[t]he mere existence of a scintilla of evidence" for elements on which he bears the burden of production. *Anderson*, 477 U.S. at 252. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

**DISCUSSION**

5

I.      **Defendant's Statutory Duties to Plaintiff**

The Longshore and Harbor Workers' Compensation Act ("Act") establishes that longshore workers who are injured "by the negligence of a vessel . . . may bring an action against such vessel as a third party." 33 U.S.C. § 905(b) (West 2001).[4] Congress, however, did not enumerate standards for measuring such negligence but rather left them "to be resolved through the 'application of accepted principles of tort law and the ordinary process of litigation– just as they are in cases involving alleged negligence by land-based third parties.'" H.R.Rep. No. 1441, 92d Cong., 2d Sess. (1972) *reprinted in* 1972 U.S.C.C.A.N. 4698, 4704 (cited in *Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156, 165-66 (1981) and *Serbin v. Bora Corp., Ltd.*, 96 F.3d 66, 70 (3d Cir. 1996)). Consequently, the Supreme Court has established the general framework for claims brought under this provision, and the lower federal courts have followed suit.

In *Scindia Steam Navigation Co.*, the Court explained "that the vessel owes to the stevedore and his longshoreman employees the duty of exercising due care 'under the circumstances.'" 452 U.S. at 166. From this general principle, the court extracted three specific duties that shipowners owe to longshore workers, now referred to as the: (1) "turnover" duty, (2) "active operations" duty, and (3) "intervention" duty. *Id.* at 166-169; *Serbin*, 96 F.3d at 70. Plaintiff concedes that the intervention duty is inapplicable to his case. Thus, the court will consider the first and second of the duties delineated by the Court in determining whether plaintiff's evidence establishes a genuine issue of material fact as to defendant's liability under the Act.

---

[4] In 1972, Congress amended this provision, which "radically changed the scheme of things" by shifting greater liability to the stevedores who employ longshore workers and abolishing no fault liability that was previously premised on a concept of "unseaworthiness" in the earlier version of the statute. *Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156, 165 (1981). As a result, a longshore worker's right to recover against a shipowner was retained solely on a theory of negligence.

A.    **The Turnover Duty**

The turnover duty refers to a shipowner's obligation with respect to transferring control

of areas of the vessel, its equipment, and cargo, to the stevedore and its longshore workers. *Serbin*,

96 F.3d at 70.  This duty is dyadic, "compris[ing] 'both a duty to provide safe conditions and a

corollary duty to warn of known, nonobvious hazards' in instrumentalities and areas 'turned over' to

the stevedore's control." *Serbin*, 96 F.3d at 70 (quoting *Kirsch v. Plovidba*, 971 F.2d 1026, 1028

(3d. Cir. 1992)).[5]

As to the first arm of the duty,

> [a] vessel must . . . turn over the ship and its equipment and appliances 'in such
> condition that an expert and experienced stevedoring contractor, mindful of the
> dangers he should reasonably expect to encounter, arising from the hazards of the
> ship's service or otherwise, will be able by the exercise of ordinary care' to carry
> on cargo operations 'with reasonable safety to person and property.

*Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 98 (1994) (citing *Federal Marine Terminals,*

*Inc. v. Burnside Shipping Co.*, 394 U.S. 404 (1969)).

The second arm of the turnover duty stems from the first.  Because the shipowner must

simply "provide a workplace where skilled longshore workers can operate safely . . . a shipowner

can ordinarily, reasonably rely on the stevedore (and its longshore employees) to notice obvious

hazards and to take steps consistent with its expertise to avoid those hazards where practical to do

so." *Kirsch*, 971 F.2d at 1029-30.[6]  Thus, generally the duty to warn extends to known nonobvious

---

[5] Although typically cases invoking this duty involve the condition of the vessel itself or
of the vessel's equipment employed during the stevedoring operations, "[t]he turnover duty to
warn . . . may extend to certain latent hazards in the cargo stow." *Howlett v. Birkdale Shipping
Co., S.A.*, 512 U.S. 92, 99 (1994).

[6] As the *Scindia* court explained,  "as a general matter, the shipowner may rely on the
stevedore to avoid exposing the longshoremen to unreasonable hazards.  451 U.S. at 170 (quoted
in *Kirsch*, 971 F.2d at 1029).  Consequently, the Court "places the primary burden on the
stevedore for avoiding injuries caused by obvious hazards. *Id*. at 180 (quoted in *Kirsch*, 971

dangers. *Serbin*, 96 F.3d at 70.

This rule regarding obviousness is not absolute.[7]  "[A] shipowner may be negligent for failing to eliminate an obvious hazard that it could have eliminated . . . when it should have expected that an expert stevedore could not or would not avoid the hazard and conduct cargo operations reasonably safely." *Kirsch*, 971 F.2d at 1031.  Such an expectation may stem from the fact that the obvious hazard is "practically unavoidable." The avoidability of a hazardous condition is often "one of degree, for the standard is not whether it was absolutely impossible to avoid the hazard but whether, under all the circumstances, safer alternatives were impractical." *Id*. at 1030.  A shipowner may also be negligent for an obvious hazard "because custom, positive law or contract instructs the shipowner to rectify the particular hazard, regardless of its obviousness." *Id* at 1031.  For example, in instances where "a shipowner should know that longshore workers frequently

---

F.2d at 1029).

[7]  Defendant argues, and cites Third Circuit caselaw as support, for the proposition that obviousness is an absolute bar under the turnover duty where the hazardous condition existed in the cargo.  Although the case of *Howlett* supports this principle and the subsequent case of *Serbin* discusses the cargo distinction, the reasoning underlying this distinction does not apply in this case and warrants instead the application of the rule articulated in *Kirsch*.  *Howlett* involved a hazard created by the foreign stevedore that had loaded the cargo, rather than a hazard created by the vessel's failure to properly stow the electrical cords attached to the cargo, as required under the charter with the owner of the cargo.  512 U.S. at 94-95; *see Serbin*, 96 F.3d at 76, n. 8.  The reasoning underlying the distinction made by *Howlett* reflects the general rule of *Scindia* that a vessel does not have a duty to inspect and supervise activity and areas that are not its primary responsibility in order to discover latent hazards that will endanger the longshore workers.  *Id*. at 102-04.  Of course, in the present instance, this reasoning is not applicable because the hazard was undisputedly part of the crew's responsibility.  They did not need to inspect or supervise to find it because they created it.  As such, the facts of the present case are more comparable to those of *Kirsch*, in which the hazardous condition, although admittedly involving an area of the ship rather than the cargo, involved a domain within the ambit of the crew's responsibility, like the electrical cords in the case now before this court.  971 F.2d at 1027-28.  Accordingly, it is consistent with the spirit of *Scindia*, as well as subsequent precedent, to hold that the present case falls within the category of turnover duty cases in which obviousness is not an automatic bar to recovery for a ship's negligence.

confront rather than avoid a type of obvious hazard . . .  the shipowner may be negligent in not eliminating the hazard, although the plaintiff's recovery may be reduced according to his or her comparative fault." *Id.* at 1031 (citing *Griffith v. Wheeling-Pittsburgh Steel Corp.*, 657 F.2d 25, 27-28 (3d Cir. 1981), for holding that shipowner who should have known that plaintiff might negligently try to remove stuck hatch cover was comparatively negligent as well).

Our court of appeals "has consistently stated that obviousness is generally a question for the jury, not often appropriate for resolution by the court on summary judgment." *Serbin*, 96 F.3d at 73(citing *Davis*, 16 F.3d at 540 and *Kirsch*, 971 F.2d at 1030).  This general rule includes the related issue of avoidability as well.  *Id.* at n.6.

Plaintiff contends that the defendant shipowner breached its turnover duty by providing a ship with cargo that could not be unloaded with reasonable safety to the longshore workers, even with the latter's exercise of reasonable care.  He argues that the crew's failure to properly stow the cargo's electric cords, combined with their tying the particular cord defectively such that it would not remain bundled, was a hazard of which the ship was aware and which it did not rectify prior to discharge.[8]  Plaintiff claims that this hazardous condition caused in an emergency in which plaintiff

---

[8]  It is the court's understanding that had the cords been defectively tied yet properly stowed this would not have been a hazard because even if they had become untied during the unloading, they would not have had the opportunity to fall down and become an obstacle for the longshore workers.  Additionally, if the cords were effectively tied in a bundle, although the cords might have hung down a few feet because they had not been properly stowed, they would not have caused the dangerous situation that confronted plaintiff because they would not have been hanging down so low, which increases the likelihood that they will collide with longshore workers or other cargo on their way to the shore.  The longshore workers often unloaded cargo that had cords hanging down a few feet but were effectively tied, a condition that did not cause the same level of hazard.  Accordingly, it appears that based upon plaintiff's allegations and evidence, it is the combination of these two elements, rather than either standing alone, that composed the hazardous condition that endangered plaintiff.  Defendant no where disputes plaintiff's assertion that in order to become unbundled, the cord must have been defectively tied by the crew.

was forced to urgently improvise.  Because plaintiff presents evidence from which a rational juror

could find that defendant breached its turnover duty thereby causing plaintiff's injury, there are

genuine issues of material fact to be resolved and summary judgment would be inappropriate.

As to the vessel's awareness of the hazardous condition, it is undisputed that the crew knew

that the cords were not stowed, and there is evidence that such a condition was hazardous to the

longshore workers responsible for unloading the cargo. The captain of the M/V Tundra Trader,

Oleksandr Tsambalyuk, explained at his deposition that properly stowing the cords was part of the

crew's responsibility and that in fact they were ordered to so prepare them.  Pl. Ex. 4 (Dep. of

Tsambalyuk) at 49, 52, 53, 66.[9]  The captain further acknowledged that the condition of the cords,

hanging down rather than put away in their containers, was dangerous to the stevedoring team.  *Id*.

at 100-01.[10]

---

[9]    Q:    . . . you testified that when the vessel arrived at Cape Henlopen you then
ordered the chief mate and the reefer engineer and the electrician to unplug
and put away the cords into the container pockets is that correct?

    A:    Correct.

    . . .

    Q:    Now, your order to the chief mate and others to unplug and bundle up and
stow the electrical cords included the containers on the third tier, did it not.

    A:    Yes.

    . . .

    Q:    And that work of disconnecting the cords and bundling up the cords and
putting them into the container pockets was all supposed to be done before
the longshoremen started discharging the next day, wasn't it?

    A:    Correct.

    . . .

    Q:    If all the cords were not in the container pockets then the vessel was not
ready for discharge; isn't that correct?

    A:    That is correct.

Pl. Ex. 4 (Dep. of Tsymbalyuk) at 49, 52, 53, 66.

[10]    Q:    Captain, you testified in response to one of Mr. Smith's questions that you
agreed [with the assessment by the Del Monte operator for the vessel] . . .

The defendant counters by positing that the hazardous condition was obvious to the longshore workers, thereby precluding the shipowner's negligence. Defendant's argument fails at the summary judgment stage because there is evidence supporting both parties' positions on the hazard's obviousness and avoidability which indicates that defendant's fulfillment of the turnover duty involves genuine issues of material fact for jury determination.

The shipowner defendant asserts that the hazardous condition was obvious because it is undisputed that the longshore workers noticed that the cords were hanging down and the DRS ship foreman was aware, based upon experience, that cords become unbundled occasionally. Ship foreman Collins stated at his deposition that cords come unbundled "from time to time." Yet, this does not conclusively render the hazardous condition of the electrical cord on that day obvious to the longshore workers. Although it is undisputed that the condition of the cords hanging outside and below their respective containers was obvious, defendant presents no evidence that any of the longshore workers were aware that one of the cords was defectively or poorly tied on the day of the accident. In fact, immediately preceding the accident, the longshore workers had successfully unloaded at least ten carriages from the cargo, from the third tier, with cords hanging down a few feet, none of which became unbundled during the process. Pl. Ex. 7 (Dep. of Collins) at 34-37. This could have confirmed the longshore workers' expectation that the cords had been adequately tied, even if not properly stowed, by the crew.

---

He's saying that a cord hanging down is dangerous to the longshoremen . . . In reading this, do you agree that a cord hanging down would be dangerous to a longshoreman [sic]? Do you actually agree with that?

. . .

A:      Of course, it's dangerous . . ..

Pl. Ex. 4 (Dep. of Tsyambalyuk) at 100-01.

There is further evidence that the state of the cords was not obvious to the DRS workers. As hatch boss Edward Lamb testified at his deposition, when asked about the condition of the cords, "Who would know that one of those cords were going to let go and get jammed? That's something that we couldn't–that was unforseen." Pl. Ex. 8 (Dep. of Lamb at 88-89). Even common sense indicates that the longshore workers could not possibly know that the electrical cord that caused the accident was tied ineffectively unless they were warned of it by the ship's crew. The longshore workers were not involved with tying and stowing the cargo's electrical cords. The competing evidence on the issue of obviousness engenders a genuine issue of material fact which must be retained for jury consideration.

Furthermore, summary judgment must be denied because even if a jury finds that the hazardous condition was obvious to the stevedoring organization, that same jury could still find the shipowner defendant negligent because there is evidence that the shipowner should have expected that an expert stevedore could not or would not avoid the hazard and thus would not be able to conduct cargo operations reasonably safely. There is evidence that could justify a jury finding both that the danger of the cord's condition was "practically unavoidable" and that based on custom and/or contract, the shipowner defendant knew that the longshore workers would likely confront rather than avoid the hazard.

First, as to the issue of avoidability, the court conceives of only two ways in which the longshore workers could avoid the hazard of the hanging, defectively tied, electrical cords, and the moving party suggests no other. The stevedore could have: (1) refused to discharge the cargo until the crew fulfilled their obligation to properly stow the cords or (2) attempted to stow the cords themselves before beginning the unloading process. The stevedore attempted the first option and the second was not possible.

12

Hatch boss Lamb testified that he explicitly asked the ship's crew to remove the hazard by placing the electrical cords properly in the containers.  Pl. Ex. 8 (Dep. of Lamb) at 39-40.  The crew responded by claiming that they did not have ladders tall enough for the task.[11]  Therefore, these members of the crew necessarily were aware that the longshore workers would confront the hazard. According to ship foreman Collins, this was a recurring problem; repeatedly, the cords on the third tier were not properly placed in their containers, he would ask them to do so, and they would say they couldn't.  Pl. Ex. 7 (Dep. of Collins) at 39.  Additionally, Lamb explained that the stevedoring operation had to be completed and that the stevedore cannot refuse to unload except for rare instances when it was clear they could not minimize the danger involved.[12]  He further explained that cords hanging down, but remaining tied, was a condition that they had faced many times, the danger of which his team had minimized in the past by taking great care while unloading.[13]

---

[11]    A:    And there was crew members up on the ship.  I hollered up to them that this cord should be put away.  They instructed me they didn't have a ladder high enough to do it.
        Q:    This is what somebody that you yelled up –
        A:    No.  The three crew men were sitting up in number one hatch.
        Q:    Okay.
        A:    I said, this is your job, I said to them.  And they said we have no ladder to get up there.  So, that's why we continued doing it the way we did it.

Pl. Ex. 8 (Dep. of Lamb) at 39-40.

[12]    Q:    Were there situations where the discharge operation would be stopped because of a dangerous situation?
        A:    If it was something that we couldn't minimize the danger involved, where it wasn't fairly reasonably safe, yes, there would be.

[13]    Q:    Well, when you saw the cords hanging down, did you believe that you could safely discharge those cords?
        A:    If the cords would have stayed tied, we could have took our time and swung out easily and things like that. . . .
              . . .
        Q:    But, you felt as an experienced longshoreman, that you would be able to

With respect to the stevedore's second option in avoiding the hazardous condition of the hanging, defectively tied electrical cord, it was impossible because they did not have a ladder tall enough for the task.  Pl. Ex. 7 (Dep. of Collins) at 40.

A second point regarding the issue of avoiding the hazard is that a jury could conclude that custom or contract should have indicated to defendant shipowner that, despite obviousness, the longshore workers would not avoid the hazard created by the defectively tied, unstowed, electrical cords.  Ship foreman Collins explained at his deposition that his crew had an "ongoing problem" with the crew of the M/V Tundra Trader and its sister ship failing to properly stow the electrical cords.  Pl. Ex. 7 (Dep. of Collins) at 37.  Collins also explained that each time this happened, DRS asked the crew to properly stow the cords and the latter claimed that they could not.  *Id*. at 39.  The stevedore never, however, refused to discharge the vessel despite this condition.  Thus, there is evidence that a jury might find sufficient to conclude that a custom had developed in the operations involving DRS and the M/V Tundra Trader in which the crew would leave the third tier cords hanging, for the stevedore to request that they be put away, for the crew to refuse, and for the longshore workers to, nevertheless, discharge the improperly prepared cargo.

Regarding the defendant's expectation based upon the contract, plaintiff asserts, and defendant does not dispute, that defendant was contractually obligated to properly stow the cargo, including the attached electrical cords.  Arguably then, despite the condition's obviousness, this

---

                    safely get those containers off the way they were?
A:     The way they were situated at the beginning –
Q:     Right.
A:     – with the cords tied.
Q:     So you did feel that you could safely do the job?
A:     Yes.

Pl. Ex. 8 (Dep. of Lamb) at 88-89.

14

contractual obligation renders defendant negligent for failing for properly stow the cords, an argument properly made before the fact-finder.

Consequently, there is more than a mere scintilla of evidence that the hazardous condition in question was not wholly obvious to the longshore workers, and even if a jury decides that it was obvious, there exists more than a mere scintilla of evidence that the longshore workers could not practically, or would not, avoid it, which could result in complete or partial liability for the defendant, whichever is commensurate with its fault. Consequently, there are genuine issues of material fact bearing on the defendant shipowner's fulfillment of the turnover duty, and thus, this is a question that must be reserved for the jury.

### B. The Active Operations Duty

When applicable, the active operations duty "requires the ship, after unloading has begun, not to take negligent actions in areas under its control that threaten the longshoremen's safety." *Serbin v. Bora Corp., LTD.*, 96 F.3d 66, 70 (3d Cir. 1996). As the Supreme Court articulated in *Scindia*, "the vessel may be liable if it actively involves itself in the cargo operations and negligently injures a longshoreman or if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." 451 U.S. at 167.

In order to trigger the active operations duty, "the vessel must have substantially controlled or been in charge of (I) the area in which the hazard existed, (ii) the instrumentality which caused the injury, or (iii) the specific activities the stevedore undertook." *Davis v. Portline Transportes Maritime Internacional*, 16 F.3d 532, 540 (3d Cir. 1994) 540.[14] "The purpose behind the

---

[14] The Third Circuit has held that "*Scindia* compels the holding that the shipowner has no duty to supervise or inspect cargo loaded or unloaded by stevedores . . .." *Derr v. Kawasaki Kisen K.K.*, 835 F.2d 490, 493 (3d Cir. 1987). The *Derr* court noted the Supreme Court's

control/charge component is to ensure that . . . the active operations duty does not supplant the turnover duty/duty to warn . . . [when the duty involves] areas under the stevedore's control. *Davis*, 16 F.3d at 541.[15]

In his opposition memorandum, plaintiff launches directly into evaluating whether the shipowner defendant breached the active operations duty without first addressing whether the duty was ever triggered. Plaintiff makes one conclusory statement bearing on this threshold issue. He states that "the cords at all times remained under the control of the shipowner." Mem. In Oppos. at 12.[16] Not only is this statement merely conclusory, but it also belies the facts as plaintiff has presented them.

Based on plaintiff's version of the facts, there is no indication that the crew retained the requisite control, once the unloading of the cargo began, to trigger the active operations duty. There is no evidence that the crew controlled the area in which the stevedoring team was working. There

---

exception where a contract provision, positive law, or custom otherwise dictates, which is an exception that plaintiff implores this court to apply. *Id* (citing *Scindia*, 451 U.S. at 172). I will address defendant's contractual duties within the next section.

[15] Once the duty is triggered, it has been breached if plaintiff shows that the vessel "actively involve[d] itself in the cargo operations and [1] negligently injured a longshoreman, or [2] fail[ed] to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." *Scindia*, 451 U.S. at 167; *Davis*, 16 F.3d at 537. Our court of appeals delineated a more concrete list of four elements that establish a breach of the active operations duty; however, this court will not discuss them because I need not reach the issue of breach.

[16] Plaintiff supports this conclusory statement with the facts that both ship foreman Collins and hatch boss Lamb asked members of the vessel's crew about the hanging cords and the latter explicitly asked them to put them in their containers. Mem. In Oppos. at 12. Then plaintiff asserts that "[i]t is undisputed in this case that the cords were exclusively the responsibility of the crew, so the active operations duty is triggered." *Id.* Plaintiff appears to misunderstand the focal point of this duty. The active operations does not concern the issue of "responsibility" but rather the central issue is one of "control" once the stevedoring operation, here the discharge of cargo, has begun.

is no evidence that the crew controlled the instrumentalities employed by the stevedoring operation

or which caused plaintiff's injury.  There is no evidence that the crew either actively participated in

or supervised the discharging process.  Plaintiff presents no evidence to support the notion that

defendant retained any control whatsoever, much less substantial control, over the domain of the

stevedoring operation once the unloading began.  Accordingly, on plaintiff's evidence, there is no

indication that the active operations duty was triggered in the present case.  Therefore, plaintiff will

not be permitted to proceed at trial with respect to this duty.

## II.    Defendant's Contractual Duty to Plaintiff

Plaintiff contends that defendant had a contractual duty to supervise DRS's stevedoring

operations.  Plaintiff posits that the shipowner's contractual duty to supervise was established by the

head charter and sub-charter between the shipowner and the charterers, Lauritzen and Del Monte.

Plaintiff cites four contract provisions that supposedly trigger this duty.[17]  Plaintiff's argument,

---

[17]    13.  Responsibility and Exemption
. . . The cargo to be loaded, stowed and discharged under the Master's supervision and Owner's responsibility.  Pl. Ex 1 (Head Charter) cl. 13.

67.  Attendance
Owners to provide at [sic] their expenses one Officer and required crew on deck during whole time of loading/discharging to prevent any pilferage or misconduct to the cargo and also watch and secure proper handling and/or stowing of the cargo.  Pl. Ex. 1 (Rider to Head Charter) cl. 67.

9.  Master
Stowage to be performed under Master's careful supervision and Owners' responsibility.  Pl. Ex. 2 (Sub Charter with Del Monte) cl. 9.

59.  Attendance
Owners to provide at their expenses one crew watchman per hold, and one Officer on deck during whole time of loading/discharging to prevent any pilferage or misconduct to the cargo and also watch, supervise and secure proper handling and/or stowing of the cargo.  Pl. Ex. 2 (Sub Charter with Del Monte) cl. 59.

Defendant does not dispute that it was obligated, to Lauritzen originally and Del

however, is premised on an unsound interpretation of the applicable Supreme Court caselaw. Furthermore, even if defendant owed such a duty *to plaintiff*, which is highly questionable, plaintiff has failed to present any evidence as to how defendant's breach of such a duty caused plaintiff's injuries in fact.

Plaintiff's contractual duty argument is based on the language in *Scindia* in which the Court reserved specific limited exceptions to the general rule that a shipowner has no duty to supervise stevedoring operations "absent contract provision, positive law, or custom to the contrary." Mem. In Oppos. at 19 (quoting *Scindia*, 451 U.S. at 172). Plaintiff fails, however, to appreciate the context of these exceptions which determines their applicability. That context is informed by the balance of the Court's statement, not quoted in plaintiff's memorandum, and clarified later in the Court's opinion.

The *Scindia* court stated, in full, "that absent contract provision, positive law, or custom to the contrary . . . the shipowner has no general duty by way of supervision . . . to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore." *Id*. Regarding the context, as this complete quote makes clear, the "contract provision" exception is only relevant to the shipowner's duty to the stevedore if the contract provision in question involves a duty to discover *dangerous conditions* as related to the *stevedoring operation*. This is confirmed later in the *Scindia* opinion where the Court reiterates that, in reference to the applicable duties that the shipowner owes the stevedore and its employees, "[i]t may also be that the contract between the *stevedore* and the *shipowner* will have provisions specifically bearing on the dispute." *Id*. at 176, n. 23 (emphasis added). It appears that our court of

---

Monte subsequently, to fulfill these provisions; it disputes that it owed this contractual duty to the longshoreman plaintiff who was not a party to these charters.

appeals has yet to consider the precise issue of whether a contract between the *shipowner* and *charterer* may impact the duties that the former owes the stevedore.  One of our sister circuits considered this exact language of *Scindia* in a factually similar case and similarly interpreted the Court's rule to apply to contracts between stevedores and shipowners such that "a contract between the time charterer and the shipowner does not affect the duty owed by the shipowner to the longshoremen."  *Carpenter v. Universal Star Shipping, S.A.*, 924 F.2d 1539, 1545 (9th Cir. 1991).[18]

Further support for this construction of the *Scindia* language upon which plaintiff relies is found in caselaw from our court of appeals.  Like the present plaintiff, in *Derr v. Kawasaki Kisen, K.K.*, plaintiff was a longshore worker suing the shipowner for injuries he sustained while plaintiff was unloading the ship's cargo.  835 F.2d 490, 491 (3d Cir. 1987).  Interpreting the same language of *Scindia* that plaintiff attempts to invoke, the Third Circuit considered whether the crew's custom of observing the discharging of cargo triggered a general duty to supervise the stevedore.  The court held that:

> Even if it were true that a vessel customarily observes the loading of cargo, understandable in light of its potential liability for certain damage to cargo, we agree with the district courts that such observation cannot be used to reimpose the general duty to supervise the stevedore.  Nor can such observation be vaulted into the type of active involvement and control that would trigger the ship's liability.

---

[18]  Plaintiff attempts to distinguish this Ninth Circuit case based on the fact that the contractual language that the plaintiff attempted to invoke was "vastly different from the one before the court." Mem. In Oppos. at 19.  First, the provisions cannot reasonably be said to be "vastly different."  The provision cited in the Ninth Circuit case obligated the shipowner to be responsible for "proper storage" and to keep "strict account of all cargo loaded and discharged." *Carpenter v. Universal Star Shipping, S.A.*, 924 F.2d 1539, 1545 (9th Cir. 1991).  Despite plaintiff's argument, this provision seems notably similar to those cited by the plaintiff in this case which require the shipowner to ensure proper handling and stowing and to prevent theft. *See infra*, n. 21.  Second, the Ninth Circuit relies on the interpretation of the *Scindia* contract exception as applying to the contract between the stevedore and shipowner, irrespective of the specific contractual provision in question.

*Id.* at 494 (citations omitted).

Comparably, the fact that the shipowner is contractually obligated to the charterer to supervise the handling of the latter's cargo to prevent damage or looting, does not reimpose a general supervision duty owed to the stevedoring operation for the purposes of liability for a longshore worker's physical injuries. Although *Derr* involved custom rather than contract, the Supreme Court in *Scindia* did not differentiate between these possible non-statutory sources of duty, so there is no reason to expect that the Third Circuit's interpretation of the Court's exception would be any different had a contract been involved.

Accordingly, the *Scindia* Court's contract exception is logically interpreted to be premised on the Court's envisioning contract provisions between the stevedore and shipowner, provisions that specifically address the dangerousness of conditions that the longshore workers might encounter during their stevedoring operations.

The contract provisions to which plaintiff refers are in no way within this envisioned category of contractual provisions that can affect the duties of a shipowner to longshore workers. First, the provisions are from the head charter between the shipowner defendant and the charterer Lauritzen Reefer.[19] Plaintiff is undisputedly not a party to this charter. Moreover, plaintiff presents no evidence that either party to the charter intended longshore workers to be third party beneficiaries to, and thus benefit from, the charter. Second, the specific provisions that plaintiff cites have no relationship to the conditions on the vessel that are dangerous to the longshore workers.[20]

---

[19] The defendant shipowner does not dispute that its obligations under the head charter apply to the sub charter with Del Monte.

[20] Plaintiff cites four provisions related to the shipowner's duty, to the charterer, to supervise the loading and discharging conducted by the stevedores. Two of them simply state that the shipowner's agents must supervise such activity. The other two explicitly delineate the purpose of the duty as being "to prevent any pilferage or misconduct to the cargo and . . . secure

Therefore, the charter between the shipowner defendant and the charterer did not create a duty to plaintiff to supervise the discharge of the M/V Tundra Trader's cargo.

Furthermore, even if plaintiff could establish such a duty, he would not be permitted to employ this contractual theory at trial because he has failed to even plead, much less present evidence, of causation with respect to defendant's alleged breach and plaintiff's injuries.[21]  The court cannot discern how defendant's supervision of the unloading would have prevented the accident that injured plaintiff.

Plaintiff does not suggest that any of the longshore workers conducted themselves in an unsafe manner such that intervention by the crew was necessary or even advisable.  Plaintiff asserts that the longshore workers were unloading and addressing the electrical cord problem the safest way possible, so there is no indication that the crew's supervision would have made the stevedoring operation safer.  Short of providing the stevedore a safer work environment, by placing the cords in the containers where they belonged or bundling them effectively, there is no indication that the crew could have affected the accident's occurrence. Such an action on the part of the crew involves the essence of the turnover duty as it involves the condition of the work environment that the crew relinquished to the longshore workers. Thus, the court is unable to discern plaintiff's basis for arguing that the breach of a contractual supervision duty, if owed to plaintiff, caused plaintiff's injuries in fact.

---

proper handling and/or stowing of the cargo." Pl. Stmt. of F. ¶¶ 3-7.  There is no indication that these provisions relate in any way, even tangentially, to the issue of dangerousness to longshore workers.

[21]  Under the Act, incorporating a longstanding negligence principle, in order to be actionable, the negligence of a shipowner must be shown to have caused the longshore worker's injury.  33 U.S.C. § 905(b)("In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person . . . may bring an action against the vessel . . ..").

**CONCLUSION**

For the aforementioned reasons, I will deny defendant's motion for summary judgment. There remain genuine issues of material fact regarding whether the defendant shipowner breached its statutory duty to plaintiff under the Longshore and Harbor Workers' Compensation Act. The genuine issues of material fact relate only to defendant's "turnover" duty. Accordingly, at trial, plaintiff will be limited to presenting evidence and argument regarding this duty.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEPHEN MANKUS,                                      :
                    Plaintiff,                       :
                                        :
          v.                              :          CIVIL ACTION
                                        :
SWAN REEFER 1 A/S and                :          NO. 02-3425
DEL MONTE FRESH PRODUCE, INC.,   :
                    Defendants.                :

## ORDER

And now on this _____ day of May, 2003, upon consideration of the defendant's motion for summary judgment (Doc. 31), plaintiff's memorandum in opposition (Doc. 34), defendant's reply thereto (Doc. 35), and defendant's supplemental brief (Doc. 44), it is hereby ORDERED that the motion is DENIED.

_____

William H. Yohn, Jr., Judge