## IN THE UNITED STATES  DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEPHEN MANKUS             :
                 Plaintiff,      :
                             :
    v.                    :     NO.  02-3425
                             :
SWAN REEFER I A/S         :/
                 Defendant.    :

## MOTION FOR RECONSIDERATION
## OF DEFENDANT SWAN REEFER I A/S

        Defendant Swan Reefer I A/S, by its attorneys, Rawle & Henderson, LLP,

hereby requests that this Honorable Court reconsider the Memorandum and Order entered on

May 20, 2003 and enter Summary Judgment in its favor.  Alternatively, defendant respectfully

requests that this Honorable Court amend its Order pursuant to 28 U.S.C. §1292(b) to indicate

that an immediate appeal "may materially advance the ultimate termination of the litigation" and,

in support thereof, defendant asserts the following:

        1.      On May 20, 2003, this Honorable Court issued a Memorandum and Order

denying defendant's Motion for Summary Judgment.  See Memorandum and Order attached

hereto as Exhibit "A."  In its Opinion, the Court held that there "is no indication that the active

operations duty was triggered in the present case.  Therefore, plaintiff will not be permitted to

proceed at trial with respect to [that] duty."  Id. at p. 17.  However, the Court held that there are

"issues of material fact bearing on the defendant shipowner's fulfillment of the turnover duty . . .

."  Id. at p. 15.  Therefore, since the plaintiff was permitted to proceed under the "turnover duty,"

the Motion for Summary Judgment was denied.

        2.      Defendant believes the Court's decision pertaining to the application of

the "turnover duty" was premised on several false assumptions regarding the evidence.  Also,

defendant believes the Court's decision is premised on an unprecedented and unwarranted
extension of the "turnover duty."

      3.    The Court's May 20 Memorandum reveals that the Court denied
defendant's Motion for Summary Judgment based on several factual assumptions:  (a) first, the
Court assumed that the electrical cord involved in plaintiff's accident was "defectively tied" (see
e.g. Memorandum, Exhibit "A," at p. 11); (b) second, the Court assumed that the Captain of the
vessel admitted that "the cords, hanging down rather than put away in their containers, was
dangerous to the stevedoring team"  (Id. at p. 10); and (c) third, based on the first two
assumptions, the Court assumed that it was a "combination" of the cords being "defectively tied"
and the "cords hanging down a few feet . . . that composed the hazardous condition." Id. at p. 9,
n. 8.  A review of the evidence, however, reveals that all of these assumptions lack evidentiary
support.

      4.    In his Brief, plaintiff's counsel argued that the rope holding the bundled
electrical cord was "defectively tied."  However, as defendant pointed out in its Supplemental
Brief, there is simply **no evidence** to support this allegation.  See Defendant's Supplemental
Brief at p. 22.

      5.    It cannot be assumed that the rope was "defectively tied" simply because
the cord came unbundled while the container was being discharged.  It is equally, if not more
likely, that other factors caused the rope to come untied, including:

        a)    the rope became caught or snagged on some object as the container
              was lifted and moved; or

        b)    the rope itself had a latent, unknown defect or deficiency that
              allowed it to come untied.

2

6.      In and of itself, the fact that the rope came untied does not establish that the rope was defectively tied, nor is it sufficient to raise a **genuine** issue of fact as to whether the rope was "defectively tied."  Therefore, defendant believes the Motion for Summary Judgment was denied based on an argument/assumption that is not supported by any evidence.

7.      The Court's decision is also premised on the assumption that the Captain admitted during his deposition that it was "dangerous" to allow the cords to hang "out of the containers approximately four to five feet."  See Memorandum, Exhibit "A," at pp. 2-3.  Again, plaintiff's counsel made this argument, but a review of the transcript from the Captain's deposition demonstrates this to be a false representation of his testimony.

8.      During his deposition, the Captain was specifically asked if he would "consider cords that were hanging out of the containers on the third tier by about ten feet and then bundled up and tied, . . . to be dangerous" to the containers, to the cargo, or to the longshoreman.  He responded as follows:

> Q      Left me ask you, Captain, would you consider cords that were hanging out of the containers on the third tier by about ten feet and then bundled up and tied, would you consider that condition to be dangerous to the containers?
>
> A      I cannot consider this condition like a dangerous condition.
>
> Q      Excuse me?
>
> A      I cannot consider this condition like a dangerous condition.
>
> **Q      You don't think that that's dangerous?**
>
> **A      No.**
>
> Q      Do you consider that dangerous to the cargo?
>
> A      No.

> Q      You don't consider it dangerous to anybody?
>
> A      (Indicating no.)
>
> **Q      And I'm sure you don't consider it dangerous to the longshoreman who were about to discharge the vessel; correct?**
>
> **A      Yes, that's correct.**

See Deposition of Captain Tsymbalyuk, Exhibit "B," at pp. 68-69 (emphasis added).

9.      Later on in the deposition, plaintiff's counsel asked the Captain about an

e-mail drafted by Mr. Albano, a representative of DelMonte:

> Q      Now, Mr. Albano also says in this email that in effect an electrical cord which was hanging from a container stowed in the third tier was **not rolled up** or stowed in the container pocket properly.  And then he says that that's not only dangerous to longshoremen, but it also creates the situation that can damage/cut/tear off the reefers electrical cord from the unit.  Do you agree with that?
>
> A      Yeah.

Id. at p. 91 (emphasis added).

10.      The e-mail from Mr. Albano was drafted after the accident involving Mr.

Mankus and it describes the condition where an electrical cord is "not rolled up" so it is hanging

down to its full length of 40-50 feet, **not** the condition where an electrical cord is bundled and is

hanging down a few feet below a container.  See E-mail from T. Albano (Exhibit 9 to Deposition

of Captain Tsymbalyuk) attached hereto as Exhibit "C."

11.      Finally, on page 100 of the transcript, in the section relied upon by the

Court, the Captain was asked the following questions:

> Q      Captain, you testified in response to one of Mr. Smith's questions that you agreed – **you read this statement that was by Mr. Albano**.  He's saying that a

cord hanging down is dangerous to the longshoremen and also creates a situation that it can damage the electrical cords. I believe you testified that you agreed with that. In reading this, do you agree that a **cord hanging down** would be dangerous to a longshoreman? Do you actually agree with that?

A       What do you mean, dangerous or not for the longshoremen whether the cord fall down or lie on deck or –

Q       Well, the question – Mr. Smith asked you whether you agreed with this statement and I'm asking you to reread it and tell us whether you agree with the entire statement.

A       When the container discharges it's dangerous for the longshoremen.

Q       That's what I'm asking you – when **the cords hanging down.**

A       Of course, it's dangerous. The longshoremen cannot stay in the way when they're moving the containers because it can be injured not only by electrical cord, but also by containers.

<u>See</u> Dep. of Captain Tsymbalyuk, Exhibit "B," at p. 100 (emphasis added).

12.       Therefore, a reading of the entire transcript demonstrates that the Captain did <u>not</u> consider a cord tied and handing down a few feet to be "dangerous." Instead, he agreed that it was dangerous if a cord is not "rolled up" and is hanging down **its full length** as the container was being discharged. Therefore, defendant believes that the Motion for Summary Judgment was denied based on a second argument/assumption that is not supported by the evidence.

13.       Based on these first two unsupported assumptions, the Court concluded that the "hazardous condition that endangered plaintiff" consisted of the "combination" of a "defectively tied" rope and the fact that cords were hanging down a few feet. <u>See</u> Memorandum,

Exhibit "A," at p. 9, n. 8.  However, defendant believes the Court failed to distinguish the true "hazardous condition" (i.e. an unbundled electrical cord hanging down its full length that defendant had absolutely no knowledge of until after the accident) from plaintiff's unsupported and speculative arguments as to how that hazard was created.

14.     As indicated, there is no evidence that the electrical cord was defectively tied.  Also, in his Counterstatement of Facts, plaintiff admitted that if the cord stayed bundled, the container could have been safely discharged.  See Plaintiff's Counterstatement at ¶48.  Furthermore, in its Memorandum, this Court recognized that having cords tied and hanging down a few feet below the containers is not a hazard in and of itself.  See Exhibit "A," at p. 9, n. 8.  Therefore, as a matter of law, the fact that an electrical cord was hanging a few feet below the container did not constitute an "unreasonable hazard" that creates liability for the vessel under the "turnover duty."  Kirsch v. Plovidba, 971 F.2d 1025, 1030 (3d Cir. 1992).  Thus, because of the misrepresentations and speculative arguments made by the plaintiff, defendant believes the Court failed to properly define the "hazardous condition" for purposes of its analysis.

15.     The "hazardous condition" that caused plaintiff's accident was not a cord handing down a few feet, but an electrical cord that fell down to its full length of 40-50 feet (i.e. the hazard mentioned by the Captain during his deposition).  The undisputed evidence shows that this condition did not arise until discharge operations were underway – after "turnover," **while the cargo was under the complete control and supervision of the stevedore.**

16.     Plaintiff has sought to characterize the conditions prior to discharge as hazardous because he realizes there is no basis to even allege a breach of the "duty to intervene," because there is no evidence that the vessel knew that the electrical cord  came unbundled and the vessel certainly did not have an opportunity to take action after the cord came unbundled.

6

17.     A conclusion that a hazardous condition existed prior to discharge is based on pure speculation (i.e. that a rope was defectively tied) and it imposes on the vessel owner a duty of omniscience.

18.     Plaintiff admitted in his Counterstatement of Facts that "[i]f the cords had stayed bundled and tied, the gang could have discharged the containers without accident.  The 7unbundling of the cords was **unforeseen**."  See Plaintiff's Counterstatement of The Facts at ¶48.  Yet, the analysis set forth by the Court imposes a duty on the vessel to **foresee** the unbundling of the cord based on sheer speculation that a rope was defectively tied.

19.     The Court's decision is also premised on the belief that the stevedore could not avoid the "dangerous condition."  See Memorandum, Exhibit "A," at pp. 12-14.  However, the stevedore did have the ability to avoid the danger associated with the true hazard – a cord hanging down its full length - because the stevedore could have stopped the discharge operation and: (a) asked the crew to retie/rebundle the cord; or (b) retie/rebundle the cord itself, which was certainly possible to do.  Instead, even after the cord fell, the stevedore continued the discharge operation by moving the container off-shore while trying to lift the dangling cord.

20.     Since the Court's Memorandum and Order is premised on several unsupported assumptions regarding the evidence, defendant requests that this Court reconsider its Order and enter Summary Judgment in its favor.

21.     In addition, in its decision, the Court suggested that the open and obvious nature of the alleged hazard is not an "absolute bar" to liability under the turnover duty, even though the alleged hazard arose from the condition of the cargo.  As noted above, this conclusion is based on unsupported assumptions regarding the evidence, including a mischaracterization of the "hazardous condition."  However, defendant believes the Court's Opinion, as it presently

828660 v.1

stands, represents an unprecedented and unwarranted extension of the turnover duty, since it allows a longshoreman to pursue a negligence action based on an open and obvious cargo hazard.

22.    Defendant believes the holding of this Court is directly at odds with the opinion issued by the United States Supreme Court in Howlett v. Birkdale Shipping Co., S.A., 512 U.S. 92 (1994) and various decisions issued by the Third Circuit Court of Appeals, which hold that, when analyzing the duty of care owed by a vessel owner, "the cargo stow is separate and distinct from other aspects of the ship." Howlett, 512 U.S. at 104.

23.    Based on the controlling caselaw that defines a vessel's owners duties pertaining to cargo hazards, defendant respectfully requests that this Court reconsider its Order and enter summary judgment in its favor.  Alternatively, defendant request that this Court amend its Order to indicate that it involves "a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the Order may materially advance the ultimate termination of the litigation."  28 U.S.C. §1292(b).

24.    If this case proceeds to trial based on the analysis set forth in the Court's May 22 Memorandum, an appeal will be necessary since the Court's analysis creates an unprecedented and unwarranted extension of the "turnover duty."  Therefore, defendant believes that an immediate appeal will add more certainty to the litigation and, ultimately, will reduce the length of the litigation.

WHEREFORE, defendant Swan Reefer I A/S respectfully requests that this Court reconsider its Order and enter Summary Judgment in its favor.  Alternatively, defendant requests

828660 v.1

that this Court amend its Order to indicate that an immediate appeal is warranted in accordance with 28 U.S.C. §1291(b).

Respectfully submitted,

RAWLE & HENDERSON, LLP

BY: _____
        Carl D. Buchholz, III, Esquire
        Michael P. Zipfel, Esquire
        Attorney for Defendant,
        Swan Reefer I A/S

        The Widener Building
        One South Penn Square
        Philadelphia, PA 19107
        (215) 575-4200

Date:  June 4, 2003

9

**IN THE UNITED STATES  DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

STEPHEN MANKUS                           :
                    Plaintiff,           :
                                         :
        v.                               :        NO.  02-3425
                                         :
SWAN REEFER I A/S                        :
                    Defendant.           :

**MEMORANDUM OF LAW IN SUPPORT**
**OF MOTION FOR RECONSIDERATION**

**I.    FACTS**

        On May 20, 2003, this Honorable Court issued a Memorandum and Order

denying defendant's Motion for Summary Judgment.  See Memorandum and Order attached

hereto as Exhibit "A."  In its Opinion, the Court held that there "is no indication that the active

operations duty was triggered in the present case.  Therefore, plaintiff will not be permitted to

proceed to trial with respect to [that] duty."  Id. at p. 17.  However, the Court held that there are

"issues of fact bearing on the defendant's fulfillment of the turnover duty . . . ."  Id. at p. 15.

Therefore, since the plaintiff was permitted to proceed under the "turnover duty," the Motion for

Summary Judgment was denied.

        Defendant believes the Court's decision pertaining to the application of the

"turnover duty" was premised on several false assumptions regarding the evidence.  Also,

defendant believes the Court's decision is premised on an unprecedented and unwarranted

extension of the "turnover duty."  Therefore, defendant has filed this Motion for

Reconsideration.

        The Court's May 20 Memorandum reveals that defendant's Motion for Summary

Judgment was denied based on several factual assumptions:  (a) first, the Court assumed that the

electrical cord involved in plaintiff's accident was "defectively tied" (see e.g. Memorandum, Exhibit "A," at p. 11); (b) second, the Court assumed that the Captain of the vessel admitted that "the cords, hanging down rather than put away in their containers, was dangerous to the stevedoring team" (Id. at p. 10); and (c) third, based on the first two assumptions, the Court assumed that it was a "combination" of the cords being "defectively tied" and the "cords hanging down a few feet . . . that composed the hazardous condition." Id. at p. 9, n. 8. However, all of these assumptions lack evidentiary support.

In his Brief opposing defendant's Summary Judgment Motion, plaintiff's counsel argued that the rope holding the bundled electrical cord was "defectively tied." However, as defendant pointed out in its Supplemental Brief, there is simply **no evidence** to support this allegation. See Defendant's Supplemental Brief at p. 22. The argument that the cord was "defectively tied" is based solely on the fact that the cord came unbundled during the discharge operation. However, it cannot be assumed that the rope was "defectively tied" simply because it came untied while the container was being lifted and moved off shore. It is equally, if not more likely, that other factors caused the rope to come untied, including:

a)    the rope became caught or snagged on some object as the container was lifted and moved; or

b)    the rope itself had a latent, unknown defect or deficiency that allowed it to come untied.

In and of itself, the fact that the rope came untied does not establish that the rope was defectively tied, nor is it sufficient to raise a **genuine** issue of fact as to whether the rope was "defectively tied." Therefore, defendant believes the Motion for Summary Judgment was denied based upon an argument/assumption that is not supported by any evidence.

2

828660 v.1

The Court's decision is also premised on the assumption that the Captain admitted during his deposition that it was "dangerous" to allow the cords to hang "out of the containers approximately four to five feet." <u>See</u> Memorandum, Exhibit "A," at pp. 2-3. Again, plaintiff's counsel made this argument, but a review of the transcript from the Captain's deposition demonstrates this to be a false representation of his testimony.

During his deposition, the Captain was specifically asked if he would "consider cords that were hanging out of the containers on the third tier by about ten feet and then bundled up and tied, . . . to be dangerous" to the containers, to the cargo, or to the longshoreman. He responded as follows:

> Q    Left me ask you, Captain, would you consider cords that were hanging out of the containers on the third tier by about ten feet and then bundled up and tied, would you consider that condition to be dangerous to the containers?
>
> A    I cannot consider this condition like a dangerous condition.
>
> Q    Excuse me?
>
> A    I cannot consider this condition like a dangerous condition.
>
> **Q    You don't think that that's dangerous?**
>
> **A    No.**
>
> Q    Do you consider that dangerous to the cargo?
>
> A    No.
>
> Q    You don't consider it dangerous to anybody?
>
> A    (Indicating no.)
>
> **Q    And I'm sure you don't consider it dangerous to the longshoreman who were about to discharge the vessel; correct?**

> **A**     **Yes, that's correct.**

<u>See</u> Deposition of Captain Tsymbalyuk, Exhibit "B," at pp. 68-69 (emphasis added).

Later on in the deposition, plaintiff's counsel asked the Captain about an e-mail

drafted by Mr. Albano, a representative of DelMonte:

> Q     Now, Mr. Albano also says in this email that in
> effect an electrical cord which was hanging from a
> container stowed in the third tier was **not rolled up** or
> stowed in the container pocket properly.  And then he says
> that that's not only dangerous to longshoremen, but it also
> creates the situation that can damage/cut/tear off the reefers
> electrical cord from the unit.  Do you agree with that?
>
> A     Yeah.

<u>Id.</u> at p. 91 (emphasis added).  The e-mail from Mr. Albano was drafted after the accident

involving Mr. Mankus and it describes the condition where an electrical cord is hanging down to

its full length of 40-50 feet, <u>not</u> the condition where an electrical cord is bundled and is hanging

down a few feet below a container.  <u>See</u> E-mail from T. Albano (Exhibit 9 to Deposition of

Captain Tsymbalyuk) attached hereto as Exhibit "C."

Finally, on page 100 of the transcript, in the section relied upon by the Court, the

Captain was asked the following questions:

> Q     Captain, you testified in response to one of Mr.
> Smith's questions that you agreed – **you read this
> statement that was by Mr. Albano**.  He's saying that a
> cord hanging down is dangerous to the longshoremen and
> also creates a situation that it can damage the electrical
> cords.  I believe you testified that you agreed with that.  In
> reading this, do you agree that a **cord hanging down**
> would be dangerous to a longshoreman?  Do you actually
> agree with that?
>
> A     What do you mean, dangerous or not for the
> longshoremen whether the cord fall down or lie on deck or
> –

4

> Q    Well, the question – Mr. Smith asked you whether you agreed with this statement and I'm asking you to reread it and tell us whether you agree with the entire statement.
>
> A    When the container discharges it's dangerous for the longshoremen.
>
> Q    That's what I'm asking you – when **the cords hanging down.**
>
> A    Of course, it's dangerous.  The longshoremen cannot stay in the way when they're moving the containers because it can be injured not only by electrical cord, but also by containers.

Id.  See Dep. of Captain Tsymbalyuk, Exhibit "B," at p. 100 (emphasis added).  Therefore, a reading of the entire transcript demonstrates that the Captain did not consider a cord tied and handing down a few feet to be "dangerous."  Instead, he agreed that it was dangerous if a cord was hanging down **its full length** of 40-50 feet as the container was being discharged. Therefore, defendant believes that the Motion for Summary Judgment was denied based on a second argument/assumption, that is not supported by the evidence.

Based on these first two unsupported assumptions, the Court concluded that the "hazardous condition that endangered plaintiff" consisted of the "combination" of a "defectively tied" rope and the fact that cords were hanging down a few feet.  Id. at p. 9, n. 8.  However, defendant believes the Court failed to distinguish the true hazardous condition (i.e. an unbundled electrical cord hanging down its full length that defendant had absolutely no knowledge of until after the accident) from plaintiff's unsupported and speculative arguments as to how that hazard was created.

As indicated, there is no evidence that the electrical cord was defectively tied. Also, in his Counterstatement of Facts, plaintiff admitted that if the cord stayed bundled, the

container could have been safely discharged.  See Plaintiff's Counterstatement at ¶48.

Furthermore, in its Memorandum, this Court recognized that having cords tied and hanging

down a few feet below the containers is not a hazard in and of itself.  See Exhibit "A," at p. 9, n.

8.  Therefore, as a matter of law, the fact that an electrical cord was handing a few feet below the

container did not constitute an "unreasonable hazard" that creates liability for the vessel.  Kirsch

v. Plvoidba, 971 F.2d 1026, 1030 (3d Cir. 1992).  Thus, defendant believes the Court improperly

defined the "hazardous condition" for purposes of its analysis.

The "hazardous condition" that caused plaintiff's accident was not a cord handing

down a few feet, but an electrical cord that fell down to its full length of 40-50 feet (i.e. the

hazard mentioned by the Captain during his deposition).  The undisputed evidence shows that

this condition did not arise until discharge operations were underway – after "turnover," while

the cargo was under the complete control and supervision of the stevedore.

## II.    LEGAL ARGUMENT

In its Memorandum and Order dated May 20, 2003, this Court concluded that

"there are genuine issues of material fact bearing on the defendant shipowner's fulfillment of the

turnover duty," so the Court denied defendant's Motion for Summary Judgment.  In doing so, the

Court suggested that an experienced longshoreman can recover from a vessel owner if he is

injured by an open and obvious cargo hazard.  In Section B of this Brief, defendant will explain

why this part of the Court's decision constitutes an unprecedented and unwarranted extension of

the "turnover duty."  However, this legal issue should be academic because when the

unsupported allegations/assumptions are removed from this case and the true "hazardous

condition" is identified, it is clear that plaintiff cannot establish a breach of the turnover duty

even if obviousness does not create an absolute bar to liability.

Before the application of the turnover duty is discussed, it is critically important to distinguish the "hazardous condition" that caused plaintiff's accident from plaintiff's allegations as to how that hazard was created. The actual hazard in this case is not the presence of a tied electrical cord hanging down a few feet below a container. Plaintiff admitted in his Brief, and every witness testified, that having cords hanging a few feet below the containers was a routinely encountered condition that did not prevent the containers from being safely discharged. Furthermore, contrary to the argument made by plaintiff's counsel, the Captain of the vessel did not admit that it was hazardous to have electrical cords hanging down a few feet below the containers. In fact, the Captain testified that this was <u>not</u> hazardous. Furthermore, it is utter speculation that the rope that secured the electrical cord involved in the accident was defectively tied.

The hazardous condition in this case was the presence of an electrical cord handing down to its full length of 40-50 feet. It is undisputed that this condition did not arise until discharge operations were underway – after the vessel had been turned over and the cargo was under the complete control of the stevedore. Therefore, the turnover duty is not applicable to this case. However, plaintiff's case is based on a breach of the turnover duty because there is no basis to even allege that the vessel had a duty to intervene because there is no evidence that the vessel knew that the electrical cord came unbundled and the vessel certainly did not have an opportunity to take action after the cord came unbundled. On the other hand, the stevedore did have an opportunity to prevent the accident by stopping the discharge operation after the cord fell and arranging for it to be retied – it was tied before discharge operations began, so clearly it could have been tied a second time. Instead, even after the cord fell, the stevedore continued the discharge operation by moving the container off-shore while trying to lift the dangling cord.

7

A.    **The Evidence Is Not Sufficient To Establish A Breach Of The Turnover Duty**

To pursue a cause of action under the "turnover duty," the first requirement is that the plaintiff must show that there was an "unreasonable hazard" on the vessel at the time of turnover.  In his Brief, plaintiff argued that a breach of duty occurred because the cords were hanging down a few feet below the containers and he argued that the rope securing the electrical cord was "defectively tied."

As for the cords hanging down a few feet, plaintiff admitted in his Counterstatement of Facts that this condition did not prevent the stevedore for safely discharging the container and every witness, including all of the longshoreman, said the same thing during their depositions.  Therefore, the evidence conclusively establishes that the presence of a tied electrical cord hanging a few feet below a container was not an "unreasonable hazard" that prevented an expert stevedore from carrying on cargo operations if it exercised ordinary care.  Howlett v. Birkdale Shipping Co., S.D., 512 U.S. 97, 98 (1994), quoted on p. 7 of Memorandum and Opinion, Exhibit "A."  Therefore, the vessel did not breach the "first arm" of the turnover duty.

Furthermore, even if it could be alleged that this condition presented an unreasonable hazard to an experienced stevedore, the condition was not "practically unavoidable" since the stevedore routinely discharged containers with the cords in this condition without a problem.  If the electrical cord came unbundled, the stevedore had the ability to stop the movement of the container and rebundle the cord, just as the crew had done before discharge operations began.  Under the established caselaw, the vessel could properly rely on the expert stevedore to take this step if a hanging cord presented a hazard.  See e.g. Howlett, 512 U.S. at 101.

8

Ultimately, plaintiff's entire claim under the "turnover duty" hinges on his argument that the rope was "defectively tied." However, this argument is based solely on speculation because there is absolutely no evidence that the rope was defectively tied.

When a motion for summary judgment is filed, the law is clear that the party opposing the Motion "may not rest upon mere allegations . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Instead, the party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); see also Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (summary Judgment is appropriate "if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.") Therefore, the Third Circuit Court of Appeals has held that arguments based on **possibilities** are not sufficient to defeat a Motion for Summary Judgment.

In Fedorczyk v. Caribbean Cruise Lines, Ltd., 82 F.3d 69 (3d Cir. 1996), the Court of Appeals stated that "[t]he possibility of the existence of an event does not tend to prove its probability." Id. at 75. The Court noted that "[a] mere possibility of causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." Id. at 75, quoting Restatement (Second) of Torts §433B (1965). Therefore, in Fedorczyk, the Court of Appeals held that summary judgment was properly granted because the plaintiff's theory as to the cause of her fall in a bathtub was based on speculation not direct or circumstantial evidence. Id. at 76; see also Saldana v. Kmart Corp., 260 F.3d 228 (3d Cir. 2001) (summary judgment properly granted because "the mere possibility that something occurred in a particular way is not enough, as a matter of law, for a jury to find it probably happened that way.")

9

In this case, there is no evidence that the rope securing the electrical cord was defectively tied.  Without some evidence to support this conclusion, plaintiff's argument is nothing more than speculation, which is insufficient to defeat a Motion for Summary Judgment.

**B.    The Turnover Duty Does Not Impose a Duty to Warn About Open and Obvious Cargo Conditions**

In footnote 7 of its decision, this Court suggested that the "turnover duty," in this case, would include a duty to warn of obvious cargo hazards.  This suggestion was placed in a footnote because the Court concluded that there is a question of fact as to whether the "hazard" was obvious to the stevedore.  In particular, the court assumed that the rope securing the cord was "defectively tied" and there is "no evidence that any of the longshore workers were aware that one of the cords was defectively a poorly tied on the day of the accident."  <u>See</u> Memorandum, Exhibit "A," at p. 11.  Therefore, the Court's decision did not hinge on its opinion regarding the scope of the turnover duty.  However, if this case proceeds to trial, the scope and application of the vessel's turnover duty will be a critically important issue.  Therefore, defendant respectfully requests that this Court reconsider its Opinion.

As this Court recognized, there are two aspects of the turnover duty.  The first is a duty to use due care to prepare the "ship and its equipment" for use by the stevedore.  The second is a duty to warn.  In <u>Scindia</u>, <u>Howlett</u>, and every decision issued by the Third Circuit Court of Appeals, the courts clearly held that the first element of the turnover duty is limited to the "ship and its equipment" - it does not apply to cargo conditions.  The second aspect of the turnover duty, the duty to warn, may apply to cargo conditions – but only if the condition is hidden.  The cases interpreting the Longshore & Harbor Workers' Compensation Act have uniformly held that a vessel does not have a duty to warn a stevedore about an open and obvious cargo hazard.  The reason for this is abundantly clear – the stevedore is hired because of its

10

expertise identifying and resolving cargo hazards.  In <u>Howlett</u>, the Supreme Court specifically stated that the stevedore "is in the best position to avoid accidents during cargo operations and that the shipowner can rely on the stevedore's warranty to perform competently."  <u>Howlett</u>, 512 U.S. at 102 (citations omitted).  Furthermore, the Supreme Court stated that "[t]he stevedore's obligations in this regard may not be diminished by transferring them to the vessel."  <u>Id.</u>

In its Memorandum , this Court took the unprecedented step of suggesting that all of the attributes of the turnover duty that apply to the "ship and its equipment" may apply to cargo conditions if it can be argued that the vessel created the cargo hazard.  This suggestion is not supported by any prior precedent and, in fact, defendant believes this ruling is directly at odds with the Supreme Court's holdings in <u>Scindia</u> and <u>Howlett</u> and this ruling fails to recognize why cargo hazards are treated differently.

Before the Court issued its Memorandum, the defendant submitted a Supplemental Brief that discusses the rationale for treating cargo hazards differently.  For all of the reasons discussed in that Brief, a vessel owner does not have a duty to warn – or any other duty of care – pertaining to open and obvious cargo hazards.

The courts have not treated cargo differently based on some unrealistic notion that vessel owners simply transport cargo back and forth without ever touching the cargo or possibly creating cargo hazards.  Cargo is treated differently because stevedore is hired for its expertise identifying and resolving cargo hazards, whether those hazards are created by rough seas, a loading stevedore or some conduct of the crew.  As defendant indicated in its Supplemental Brief, this rule is consistent with the general rule that an independent contractor may not recover if he is injured by a condition he was hired to repair, whether or not the property owner allegedly

created the condition.  See West v. United State, 361 U.S. 118 (1959) and other cases cited on p. 10 of defendant's Supplemental Brief.

As discussed above, there is no evidence that the rope securing the electrical cord was "defectively tied."  Therefore, the only relevant "condition" that existed at the time of turnover was the presence of electrical cords that were hanging a few feet below the containers that were stowed on the third tier.  As this Court recognized, this condition was obvious and known to the longshoremen.  See Exhibit "A" at p. 11.  Therefore, as a matter of law, plaintiff cannot establish a breach of the "turnover duty" because a vessel owner does not have a duty to warn of open and obvious cargo conditions.

## III.     CONCLUSION

WHEREFORE, defendant Swan Reefer I A/S respectfully requests that this Court reconsider its Order and enter Summary Judgment in defendant's favor.  Alternatively, defendant requests that this Court amend its Order to indicate that an immediate appeal is warranted in accordance with 28 U.S.C. §1291(b).

Respectfully submitted,

RAWLE & HENDERSON, LLP

BY: _____
              Carl D. Buchholz, III, Esquire
              Michael P. Zipfel, Esquire
              Attorney for Defendant,
              Swan Reefer I A/S
              The Widener Building
              One South Penn Square
              Philadelphia, PA 19107
Date:  June 4, 2003              (215) 575-4200

12

828660 v.1

## IN THE UNITED STATES  DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEPHEN MANKUS                          :
               Plaintiff,          :
                             :
      v.                       :      NO.  02-3425
                             :
SWAN REEFER I A/S                        :
              Defendant.        :

### CERTIFICATE OF SERVICE

      I do hereby certify that the foregoing Motion for Reconsideration was served by First Class Mail, postage prepaid, to the following counsel of record:

                E. Alfred Smith, Esquire
                1333 Race Street, 2nd Floor
                Philadelphia, PA 19107
                Attorney for Plaintiff

                Robert Fine
                Fine & Stoud
                1333 Race Street
                Philadelphia, PA 19107
                Attorney for Plaintiff

                _____
                Carl D. Buchholz, III, Esquire

On this ____ day of June, 2003.

## IN THE UNITED STATES  DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEPHEN MANKUS                         :
                 Plaintiff,          :
                            :

        v.                                :          NO.  02-3425
                            :

SWAN REEFER I A/S                      :
               Defendant.          :

## **ORDER**

       AND NOW, this              day of                      , 2003 upon

consideration of defendant's Motion for Reconsideration and any response thereto, it is hereby

ORDERED that the Motion is GRANTED, the Order entered on May 20, 2003 is RESCINDED

and summary judgment is hereby ENTERED in favor of defendant Swan Reefer I A/S.


                                 _____

                                 William H. Yohn, Jr., Judge

**IN THE UNITED STATES  DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


STEPHEN MANKUS                          :
              Plaintiff,        :
                                             :
      v.                                    :        NO.  02-3425
                                             :
SWAN REEFER I A/S                       :
              Defendant.        :

## ALTERNATIVE ORDER

        AND NOW, this                day of                            , 2003 upon

consideration of defendant's Motion for Reconsideration and any response thereto, the Order

entered on April 20, 2003 is hereby AMENDED to advise that the Court is "of the opinion that

[the] order involves a controlling question of law as to which there is substantial ground for

difference of opinion and that an immediate appeal from the Order may materially advance the

ultimate termination of the litigation."  28 U.S.C. §1292(b).



                                     _____
                                     William H. Yohn, Jr., Judge